936 F.2d 1096
 1991-1 Trade Cases 69,465
 SCFC ILC, INC., dba MountainWest Financial, Inc., Plaintiff-Appellee,
v.
VISA USA, INC., Defendant-Appellant.
American Bankers Association; Independent Bankers
Association of America; Colorado Bankers Association; Utah
Bankers Association; California Bankers Association;
Resolution Trust Corporation; Amici Curiae,
Bankcard Holders of America; the American Financial
Services Association; Amici Curiae.
 No. 91-4042.
 United States Court of Appeals,
Tenth Circuit.
 June 18, 1991.
 
 Stephen V. Bomse of Heller, Ehrman, White & McAuliffe, San Francisco, Cal. (M. Laurence Popofsky, Jessica S. Pers, and Joshua R. Floum of Heller, Ehrman, White & McAuliffe, San Francisco, Cal., and Dale A. Kimball and Clark Waddoups of Kimball, Parr, Waddoups, Brown & Gee, Salt Lake City, Utah assisting with the briefs), for defendant-appellant.
 William H. Pratt of Kirkland & Ellis, Chicago, Ill. (Richard W. Giauque and Gary F. Bendinger of Giauque, Crockett & Bendinger, Salt Lake City, Utah, and James D. Sonda, Randall A. Hack, James H. Gale, and Leonard A. Gail of Kirkland & Ellis, Chicago, Ill. assisting with the briefs), for plaintiff-appellee.
 Elwood Holstein, Jr., Herndon, Virginia, and Mark Wallach of Wallach, Turkish, and Wallach, New York City, on the brief, for amicus curiae, Bankcard Holders of America.
 Frank M. Salinger and Robert E. McKew, Washington, D.C., on the brief, for amicus curiae, American Financial Services Ass'n.
 Leonard J. Rubin of Bracewell & Patterson, Washington D.C., Jac K. Sperling and Craig A. Umbaugh of Fairfield & Woods, Denver, Colo., on the brief, for amici curiae, Independent Bankers Ass'n, American Bankers Ass'n, Colorado Bankers Ass'n, Utah Bankers Ass'n, and California Bankers Ass'n.
 Alfred J.T. Byrne, General Counsel, Dorthy L. Nichols, Associate Gen. Counsel, Ann S. Cuross and Richard T. Aboussie, Asst. Gen. Counsel, Colleen B. Bombardier, Sr. Counsel, and Lawrence H. Richmond, Counsel, Washington, D.C. on the brief, for amicus curiae, Resolution Trust Corp.
 Before HOLLOWAY, Chief Circuit Judge, and EBEL, and BRIGHT,* Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 The issue on appeal is whether the district court erred in granting a preliminary injunction that would require the appellant to approve the manufacture and delivery of a large number of charge cards to the appellee, which intends to solicit in excess of one million potential customers to use the charge cards. Where a requested preliminary injunction will alter the status quo, the movant must show that on balance, the traditional four factors weigh heavily and compellingly in favor of granting the injunction. Because the district court below erroneously determined that the preliminary injunction requested by the appellee would not alter the status quo, it failed to require the movant to meet this heavy burden. Upon reviewing the record below, we determine that the movant did not meet the burden required of it, and that, therefore, the preliminary injunction imposed by the district court was improper. We REVERSE.
 
 FACTS
 
 2
 In mid-1989, Sears, through its wholly-owned subsidiary, Greenwood Trust Corporation (the issuer of the Discover Card), applied to Visa, U.S.A. ("Visa") to become a Visa member. Visa denied Sears' application. Immediately thereafter, the Board of Directors of Visa enacted several amendments to the Visa by-laws and operating regulations specifically precluding Sears or any of its subsidiaries from issuing Visa cards.[1]
 
 
 3
 On May 25, 1990, SCFC ILC, Inc. ("SCFC"), another wholly-owned subsidiary of Sears, acquired MountainWest Savings & Loan, a small Utah savings & loan, from the Resolution Trust Corporation ("RTC"). As a result of its purchase of MountainWest, Sears acquired a small Visa program which had been operated by the former MountainWest for the benefit of the local depositors.[2]
 
 
 4
 In June of 1990, following the SCFC takeover, Visa requested MountainWest to reapply for Visa membership pursuant to its interpretation of Visa By-law Sec. 2.08.[3] MountainWest filled out the forms as requested, but because it was taking the position that the "Visa membership asset" had not been transferred, it printed at the top of the forms, "updating existing membership information." MountainWest did not at that time notify Visa that it was owned by a subsidiary of Sears, SCFC. On January 8, 1991, Visa's suspicions were aroused when it was notified that MountainWest had ordered 1.5 million Visa cards. The size of the order alone was sufficient to trigger an investigation by Visa because MountainWest, prior to being acquired by SCFC, had issued only 5,800 Visa cards to its account holders. MountainWest requested that the cards be printed with a "Prime Option" logo, which is a registered trademark of Dean Witter, a Sears' subsidiary. Once Visa realized that MountainWest was indirectly owned by Sears, and that Sears was attempting to use
 
 
 5
 MountainWest's membership in Visa to launch its very aggressive Prime Option credit card program, Visa refused to approve the card order.
 
 
 6
 MountainWest filed suit in the United States District Court for the District of Utah raising federal and state antitrust and state unfair trade practice claims. Shortly after filing the lawsuit, MountainWest moved for a preliminary injunction to force Visa to approve the manufacture and delivery of the 1.5 million cards ordered by MountainWest. The district court granted the preliminary injunction. 763 F.Supp. 1094. Visa appealed to this court and requested that we stay the injunction pending our resolution of the issues. We granted Visa's request for a stay.
 
 DISCUSSION
 
 7
 We must determine whether the district court erred in granting MountainWest's motion for a preliminary injunction. We will not set aside a preliminary injunction "[u]nless the district court abuses its discretion, commits an error of law, or is clearly erroneous in its preliminary factual findings...." Hartford House, Ltd. v. Hallmark Cards, 846 F.2d 1268, 1270 (10th Cir.1988), cert. denied, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988). We will set aside a preliminary injunction if the district court applied the wrong standard when deciding to grant the preliminary injunction motion. See Zepeda v. United States I.N.S., 753 F.2d 719, 724-25 (9th Cir.1983).
 
 
 8
 In order to obtain preliminary injunctive relief, the moving party must establish:
 
 
 9
 (1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.
 
 
 10
 Otero Savings and Loan Ass'n, 665 F.2d 275, 278 (10th Cir.1981) (citations and quotations omitted). As a preliminary injunction is an extraordinary remedy, see GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir.1984), the right to relief must be clear and unequivocal. See Penn v. San Juan Hosp., 528 F.2d 1181, 1185 (10th Cir.1975); Matzke v. Block, 542 F.Supp. 1107, 1112-13 (D.Kan.1982). See generally 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2948, at 428-29 & nn. 19-21 (1973 & Supp.1991) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (footnotes omitted)).
 
 
 11
 In addition, the following types of preliminary injunctions are disfavored and they require that the movant satisfy an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction may be issued: (1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits.
 
 
 12
 A preliminary injunction that alters the status quo goes beyond the traditional purpose for preliminary injunctions, which is only to preserve the status quo until a trial on the merits may be had. See Otero Savings and Loan Association, 665 F.2d at 277; Penn, 528 F.2d at 1185. See generally Federal Practice & Procedure Sec. 2948, at 463-64. Mandatory injunctions are more burdensome than prohibitory injunctions because they affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction. See Note, 78 Harv.L.Rev. 994, 1062-63 (1965). Finally, a preliminary injunction that awards the movant substantially all the relief he may be entitled to if he succeeds on the merits is similar to the "Sentence first--Verdict Afterwards" type of procedure parodied in Alice in Wonderland,[4] which is an anathema to our system of jurisprudence. Thus, in order to prevail on a motion for preliminary injunction where the requested injunction falls into one or more of these three categories, the movant must show that on balance, the four factors weigh heavily and compellingly in his favor. See, e.g., GTE Corp., 731 F.2d at 679 ("The burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits."); Citizens Concerned for the Separation of Church and State v. City and County of Denver, 628 F.2d 1289, 1299 (10th Cir.1980), cert. denied, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981) (requiring a showing of compelling circumstances to justify the imposition of preliminary injunctive relief that was mandatory and which disturbed the status quo);[5] Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir.1980) (noting that because a preliminary injunction that alters the status quo is "particularly disfavored" the movant must make a strong showing of entitlement).
 
 
 13
 The preliminary injunction motion granted by the district court required Visa to approve MountainWest's 1.5 million card order bearing the Prime Option logo. Such an order would clearly have altered the status quo.[6] Visa had steadfastly refused to approve the order authorizing the new cards. As a result, MountainWest did not possess the cards for distribution. Thus, the status quo at the time the district court considered MountainWest's motion was that MountainWest was without the new cards, and Visa was continuing to refuse to approve the order.
 
 
 14
 MountainWest argues that the preliminary injunction motion granted by the district court would have preserved rather than altered the status quo because MountainWest was entitled, as a Visa member, to solicit new Visa customers, and that Visa was obligated under various federal and state laws to approve the manufacture and delivery of the cards requested by MountainWest. In particular, MountainWest claims that under the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 183 (1989) (codified throughout scattered sections of the U.S.C.), Visa cannot interfere with Sears' rights to utilize MountainWest's "Visa membership asset." 12 U.S.C. Sec. 1821(d)(2)(G)(i)(II).[7] MountainWest confuses "what should be" with "what is." While MountainWest may eventually succeed in convincing the district court, on the merits, to order Visa to issue the cards to it, a final decision so holding would unquestionably alter the status quo. The status quo is not defined by the parties existing legal rights; it is defined by the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights.[8]
 
 
 15
 Because the district court incorrectly concluded that the preliminary injunction would not alter the status quo, it failed to require MountainWest to carry its heavy burden of showing that under the four-part test in Otero, that the four factors, on balance, weigh heavily in MountainWest's favor. Thus, it abused its discretion. Because the record below is well developed, and because both parties claim a need for a resolution of this issue as quickly as possible, we see no reason to remand this case to the district court on the preliminary injunction issue; instead we will review the record to determine whether the preliminary injunctive relief requested by MountainWest is justified.
 
 
 16
 The first factor we examine is whether, in the absence of the requested injunctive relief, MountainWest will be irreparably harmed. MountainWest claims that if the injunction is not issued, it will miss its "window of opportunity" to launch the Prime Option program, and thus will be irreparably harmed. MountainWest argues that if its Prime Option program is delayed, other competitors will be able to undercut its program by offering the same product first. In addition, MountainWest claims that the Prime Option program is designed to take advantage of the current market and that as time passes, the market may change in such a way as to prejudice its ability successfully to implement the Prime Option program.[9] We do not find these arguments persuasive. MountainWest offers only generalities and business speculation to establish its irreparable injury, and its evidence falls far short of the proof that is required to make a clear showing of irreparable injury. Further, we note that in the event MountainWest succeeds on the merits of its lawsuit, the potential for treble damages further undercuts its argument that it will be irreparably harmed unless we uphold the preliminary injunction.
 
 
 17
 The second factor we address is MountainWest's claim that any injury to Visa is outweighed by the harm MountainWest will suffer if the preliminary injunction is not granted. Irreparable injury is frequently presumed where a trademark is wrongfully appropriated by another. See Processed Plastic Co. v. Warner Communications, 675 F.2d 852, 858 (7th Cir.1982). If MountainWest loses the case on the merits in the court below, Visa will have been injured because MountainWest will have improperly availed itself of the Visa mark as well as the good will carried with it. Once again, MountainWest has not met its burden of clearly establishing that its threatened injury outweighs whatever damage the proposed injunction may cause Visa.
 
 
 18
 The third factor we address is MountainWest's claim that the public interest would not be harmed if the preliminary injunction were granted. Visa claims that the public interest requires deliberate consideration, not haste, in this important controversy. There is also the underlying concern about the impact on public confidence in the nation's credit card system if 1.5 million Prime Option cards are ultimately held to have been improperly issued. MountainWest counters by arguing that its Prime Option card is so attractive that the public will be injured if its entry into the Visa charge card market is delayed. In addition, MountainWest claims that the policies underlying FIRREA will be undermined if the preliminary injunction is not entered.
 
 
 19
 If Visa were to prevail on the merits below, it is uncertain from this record whether Visa would cancel the Prime Option cards in circulation or whether the Prime Option program would simply be sold to an acceptable issuer. Thus, the potential harm to the public if the preliminary injunction is granted and later found to have been improper is speculative. Although this prong of the test does not involve a balancing of public harm, we nonetheless note that MountainWest has not established any credible significant harm to the public that would be caused by a delay in introducing the Prime Option program until after a full trial on the merits. We have reviewed the benefits associated with the Prime Option program, and, even if other credit card issuers were not already offering many of these same benefits to their customers, we do not find anything in that program that would establish a compelling public interest in having that program available to the public even before trial can be held to determine whether MountainWest has the right to provide such a program under the Visa card system.[10] Further, we disagree with MountainWest's claim that the policies underlying FIRREA will be undermined if the Prime Option program is delayed. We see no compelling reason in the particular record before us why this issue must be addressed at the preliminary injunction stage in order to preserve the policies behind FIRREA. Therefore, the public interest factor is indecisive.
 
 
 20
 The last factor MountainWest must establish is a substantial likelihood that it will succeed on the merits. The issues are complex and will need significant development before this court could posit a meaningful prediction as to the strength of MountainWest's claims and the eventual outcome on the merits. However, this does not mean that this fourth factor itself is in equipoise. It is MountainWest's burden to prove a substantial likelihood that it will succeed on the merits, and on the record before us MountainWest has not sustained that burden.[11]
 
 
 21
 After reviewing these four preliminary injunction factors, we hold that MountainWest has not met its heightened burden of showing that on balance the factors weigh heavily and compellingly in its favor. To the extent the injunction alters the status quo by requiring Visa to approve the issuance of Prime Option cards to MountainWest, it is improper. Therefore, we VACATE the preliminary injunction and REMAND to the district court for further proceedings not inconsistent with this opinion.
 
 
 
 *
 Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 Visa By-law Sec. 2.06 provides in pertinent part:
 [I]f permitted by applicable law, the corporation shall not accept for membership any applicant which is issuing, directly or indirectly, Discover cards or American Express cards, or any other cards deemed competitive by the Board of Directors; an applicant shall be deemed to be issuing such cards if its parent, subsidiary or affiliate issues such cards.
 Visa Operating Regulation 10.4B provides in pertinent part:
 No member may use the Marks of the American Express Company, Mastercard International, Sears, Roebuck and Company, or the subsidiaries or affiliates of these entities on Visa cards.
 
 
 [2]
 Unless otherwise noted in this opinion, "Mountain West" will refer to the entity now owned by SCFC ILC. "Former Mountain West" will refer to the institution as it existed prior to the RTC takeover and transfer to SCFC
 
 
 [3]
 Visa By-law Sec. 2.08 states that the membership of a participating institution terminates when the Visa "membership asset" is transferred and requires the purchaser of the transferred asset to reapply
 
 
 [4]
 L. Carrol, Alice's Adventures in Wonderland ch. 12 (1865)
 
 
 [5]
 In Citizens Concerned, the motion was originally in the form of a preliminary injunction. Then, at the request of both parties, the preliminary injunction motion was consolidated with the permanent injunction hearing
 
 
 [6]
 In addition, the preliminary injunction entered by the district court would have awarded the movant much of the relief to which it may be entitled in the event it prevails on the merits. Further, the preliminary injunction was mandatory in nature in that it required Visa to take the affirmative step of approving issuance of the new cards, even though in this particular case that would not have required a substantial amount of court involvement in assuring that Visa complied with its terms
 
 
 [7]
 Section 1821(d)(2)(G)(i)(II) provides that the RTC can transfer any asset or liability of an institution that is in default without first obtaining approval or consent for the transfer
 
 
 [8]
 To the same effect, see Stemple v. Board of Education of Prince George's County, 623 F.2d 893 (4th Cir.1980), cert. denied, 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). There, status quo was defined as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." Id. at 898. See generally Federal Practice & Procedure Sec. 2948, at 465. Visa persuasively argues that the last uncontested status between the parties was when Sears, through its Greenwood Trust subsidiary, requested membership in the Visa organization and was turned down. From that time forward, Sears never possessed the ability to market 1.5 million Visa cards under its Prime Option logo
 
 
 [9]
 For example, MountainWest produced an affidavit by B.J. Martin, the Chairman-designate of SCFC ILC and President of MountainWest, to support its preliminary injunction motion. Affidavit of B.J. Martin, Aplt.App. Vol. I at 72. In his affidavit, Martin claimed: "Given the precarious state of the economy and uncertainties surrounding resolution of the Middle East conflict, consumer attitudes may well change. Regardless, we will have to invest in studying the continued viability of the Prime Option program. And there can be no guarantee that the results of that research will suggest that our 'window' will remain open." Id. at 77. It appears to us that given the rapid resolution of the Middle East conflict, at least some of this "uncertainty" has been resolved. In any event, it is not the purpose of a preliminary injunction to provide a business guarantee to any litigant
 
 
 [10]
 Indeed, MountainWest's public interest claim is undermined by the arguments it raised in the irreparable harm section of its brief. MountainWest argued that other competitors may preempt its Prime Option program if it is not allowed to rush it to market. Clearly, if MountainWest's competitors can quickly fill this "void," the public will not be harmed by the Prime Option card's absence from the charge card market until a trial on the merits can be held
 
 
 [11]
 We have no finding from the district court on this factor. It erroneously concluded that it did not need to address this factor because it had found the other three factors in favor of MountainWest. Although there may be occasions when this factor may be deemphasized because of a particularly compelling showing on the other three factors, it ordinarily deserves some attention. Particularly in cases where the requested preliminary injunction alters the status quo, is mandatory in nature, or will grant the movant a significant part of the relief it seeks at trial, the movant will ordinarily find it difficult to meet its heavy burden of showing that the four factors, on balance, weigh heavily and compellingly in its favor, without showing a substantial likelihood of success on the merits