David J. LYONS, Commissioner of Insurance for the State of Iowa, and receiver for the Iowa Trust, Plaintiff,

v.

JEFFERSON BANK & TRUST, a Colorado corporation, Defendant.

Civ. A. No. 91–B–2245.

United States District Court, D. Colorado.

Jan. 29, 1992.

Nunc Pro Tunc Jan. 22, 1992.

_____

■■■■■■■■■■■■■■■■■■■■

---

1526

Philip E. Lowery, Marcella T. Clark, Lowery, Lamb & Lowery, P.C., Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Plaintiff moves for a preliminary injunction ordering defendant to preserve and set aside $42,843,614.13, together with income earned thereon since November 25, 1991, in an escrow account pending final resolution of this action. The motion was heard on January 21 and 22, 1992. I granted a preliminary injunction on the record at the conclusion of the hearing. In accordance with that bench ruling, these written findings and conclusions follow.

### I.

### FINDINGS OF FACT

The parties are diverse and, therefore, jurisdiction is proper under 28 U.S.C. § 1332. The defendant resides in the District of Colorado. Thus, venue is proper under 28 U.S.C. § 1391.

The Iowa Trust is a trust organized under the laws of Iowa with its principal place of business in Iowa. It was formed in January, 1989 to allow various political subdivisions within Iowa to pool their funds for investment purposes. The beneficiaries of the Iowa Trust include 88 cities, counties, and other political entities. Its assets include pension funds and other funds used by the governmental entities for essential services, payroll, and public works projects.

Plaintiff David J. Lyons is the Iowa Insurance Commissioner. He was appointed receiver for the Iowa Trust on December 19, 1991 by the Iowa District Court for Polk County. The court charged him with marshalling, recovering, and distributing the trust's assets.

Edwin S. Kahn, Walter W. Garnsey, Jr., Kelly/Haglund/Garnsey & Kahn, Denver, Colo., Anuradha Vaitheswaran, Asst. Atty. Gen., Iowa Securities Bureau, Des Moines, Iowa, for plaintiff.

Defendant Jefferson Bank & Trust is a Colorado corporation and bank with its principal place of business in Lakewood, Colorado. It has approximately $160 million in assets and 20,000 depositors. Ap-

proximately 125 depositors have accounts exceeding the FDIC insurance maximum.

Plaintiff filed this action on December 27, 1991 seeking the imposition of a constructive trust on $42,843,614.13 held by defendant. He seeks a preliminary injunction to preserve this amount, together with income earned on it since November 25, 1991, asking that it be set aside in an escrow account pending the resolution of the action. Noting that this written opinion would follow, I granted plaintiff's motion on the record on January 22, 1992 (a copy of the form of injunction is attached to this opinion as Appendix 1). By agreement of the parties and myself, this case is set on an expedited docket and trial on the merits will commence on April 27, 1992.

A. *The Iowa Trust Trades*

In early 1990, the Iowa Trust entered into an investment management agreement with Denman & Co. (Denman), a corporation owned and wholly controlled by Steven D. Wymer (Wymer). Subsequently, Institutional Treasury Management, Inc. (ITM), another company solely owned and controlled by Wymer, succeeded Denman. Pursuant to the management agreement, Wymer directed investments for the Iowa Trust and he had authority to order trades and transfers for its account. The Iowa Trust also entered into a custodian agreement with Bankers Trust Company of Des Moines, Iowa, under which Bankers Trust held the Iowa Trust's cash and securities for investment upon Wymer's directions.

On November 21, 1991, at Wymer's direction, the Iowa Trust bought $40 million principal (face) amount of 7.75% 2/15/95 United States Treasury Notes (the 1995 Notes). The 1995 Notes were placed in its custodian account at Bankers Trust.

On November 25, 1991, beginning at approximately 9:00 a.m. M.S.T., Wymer directed execution of the following transactions:

1. Bankers Trust wire transferred the 1995 Notes free (without payment) to ITM's trading account with First Interstate Bank of Denver (FIB);

2. ITM sold the 1995 Notes and deposited the proceeds of $42,843,614.13 into ITM's securities clearing demand checking account with FIB;

3. Together with additional funds in the checking account, ITM used the $42,843,-614.13 from the sale the 1995 Notes to purchase $41 million principal (face) amount of 8.625% 8/15/94 United States Treasury Notes (the 1994 Notes) at a price of $44,824,531.25;

4. FIB wire transferred the 1994 Notes free to defendant's account with Refco Securities, Inc.;

5. Refco Securities sold the 1994 Notes for $44,786,093.75 and placed the cash in defendant's account at Refco Securities;

6. Refco Securities wire transferred $44,786,093.75 to defendant's account with Refco Capital Corporation;

7. Refco Capital then wire transferred $44,927,031.25, which sum included the $44,786,093.75 derived from the sale of the 1994 Notes, to defendant.

(A graphic summary of these transactions is attached to this opinion as Appendix 2). I find that at the close of business on November 25, 1991 defendant held $42,-843,614.13 of Iowa Trust's funds derived from the sale of the trust's 1995 Notes.

Defendant's president Maurice Grotjohn testified that the bank moved these funds in and out of several securities and currently holds them in its investment account at the Federal Reserve Bank in Kansas City. Thus, I further find that defendant continues to hold funds and securities traced directly from the 1995 Notes, including interest from November 25, 1991 until the hearing on January 22, 1992. The total amount of these funds and securities subject to this preliminary injunction is $43,-173,614.13.

B. *The Jefferson Trades*

In December, 1989, defendant also entered into an investment management agreement with Wymer and his companies. By that agreement, Wymer had authority to trade and transfer funds and securities for defendant's benefit.

On November 18, 1991, defendant purchased through Wymer $41 million principal (face) amount of 8.625% 8/15/94 Notes (the Jefferson Notes) for $44,859,765.62. Shearson Lehman Brothers (Shearson) acted as broker.

Pursuant to its standing delivery instructions with Shearson, the Jefferson Notes were supposed to have been wire transferred to defendant's account with Refco Securities. However, there is no satisfying or persuasive evidence that this transfer ever occurred. Santo Maggio, president of Refco Securities, testified unequivocally that Refco Securities never received the Jefferson Notes. His uncontradicted testimony was that the notes sold on November 25 were the 1994 Notes transferred from FIB and not Shearson.

Rather, Maggio testified that between November 18, 1991 and November 25, 1991 the only $41 million principal (face) amount of 8.625% 8/15/94 United States Treasury Notes wire transferred from Shearson were deposited into the State of Wyoming's account with Refco Securities. Wyoming was also a Wymer client. I infer from these facts that Wymer misappropriated the Jefferson Notes to cover a shortfall in Wyoming's account. When defendant sought to liquidate its portfolio on November 25, Wymer misappropriated Iowa Trust's 1995 Notes to cover defendant and converted them into the 1994 Notes, when he then transferred to defendant's account.

If I grant the preliminary injunction, Grotjohn testified that his bank could fail. He said that lack of depositor confidence in the bank could cause a run on deposits that could not be paid while maintaining its current loan and investment portfolios. Further, Grotjohn testified that defendant would lose the flexibility necessary to earn a maximum return on the $42.8 million. He testified that, if I grant the preliminary injunction and freeze this money, defendant could lose approximately $1 million in net income. Finally, he noted that shareholder equity in Jefferson was close to $10 million and that the shareholders would lose this equity if the bank failed.

## C. *Wymer's Collapse*

In approximately October, 1991, the Securities and Exchange Commission (SEC) began investigating the activities of Wymer, Denman, and ITM. On December 9, 1991, the SEC filed a complaint in the United States District Court for the Central District of California alleging that Wymer, Denman, and ITM engaged in a massive securities fraud. Wymer's misappropriation of Iowa Trust's notes is alleged in that complaint.

Steen Ronlov was the Colorado representative of ITM and Wymer's close associate. In early 1990, Wymer and Ronlov began purchasing Jefferson Bank capital stock and, as of July 1991, Wymer owned 20% and Ronlov owned 4.75% of this bank's issued and outstanding stock. In July, 1991, Ronlov acquired Wymer's 20%. Ronlov was also a member of Jefferson's Board of Directors from July, 1990 until December 13, 1991.

On December 10, 1991, Ronlov tipped Jefferson Bank president Grotjohn that Wymer had resigned from ITM and that the SEC was "in." Grotjohn immediately ordered the liquidation of Jefferson's ITM managed trading account at Shearson and directed Shearson to remit the proceeds "first thing in the morning." On December 11, 1991, more than $40 million in cash was wire transferred to defendant.

On December 11, 1991, the federal district court hearing the California action appointed a receiver to examine Wymer and ITM's books. The court also froze all assets in any account managed by Wymer and ITM until the accounting could be completed. The freeze order would have applied to defendant's account at Shearson but took effect two hours after defendant withdrew its funds from this Wymer managed account. Wymer was subsequently indicted by a California federal grand jury and charged with securities fraud, mail fraud, and money laundering.

## II.

## CONCLUSIONS OF LAW

Because the parties are diverse, jurisdiction is proper under 28 U.S.C. § 1332. Be-

**1530**

cause the defendant resides in the District of Colorado, venue is proper under 28 U.S.C. § 1391.

■ The purpose of a preliminary injunction under Fed.R.Civ.P. 65 is to preserve the status quo between the parties pending a final determination on the merits of the action. *University of Texas v. Camenisch*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). A preliminary injunction is an equitable remedy and invokes the sound discretion of the district court. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). The burden is on the movant to make a prima facie showing of a probable right to the ultimate relief and a probable danger of injury if the motion is denied. *Id.* A preliminary injunction may issue if the movant clearly and unequivocally establishes four elements: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the preliminary injunction is not granted; (3) that the injury outweighs any harm the preliminary injunction will cause the opposing party; and (4) that the preliminary injunction is in the public interest. *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991). I conclude that plaintiff has made a clear and unequivocal showing on these four factors. Indeed, the showing weighs heavily and compellingly in plaintiff's favor.

■ In this diversity action, I apply Colorado's substantive law of constructive trusts to assess plaintiff's likelihood of success on the merits, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), while applying federal standards applicable to preliminary injunctive relief. *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir.1990). A constructive trust is an equitable device used to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs. *In re Marriage of Allen*, 724 P.2d 651, 656 (Colo. 1986). "[A] constructive trust beneficiary may obtain, through tracing, not merely what was lost but also other property or profits traceable to that lost property." *Id.* at 657.

When property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

*Page v. Clark*, 197 Colo. 306, 592 P.2d 792, 798 (1979). Assets subject to a constructive trust may be frozen by a preliminary injunction to preserve the corpus of the constructive trust pending trial on the merits. *Republic of Philippines v. Marcos*, 806 F.2d 344, 354–55 (2d Cir.1986).

■ Here, plaintiff has clearly traced Iowa Trust property, the 1995 Notes, from its account with Bankers Trust, through the sale of the 1995 Notes and the purchase of the 1994 Notes at FIB, to the eventual sale of the 1994 Notes and transfer of the sale proceeds to defendant. On the other hand, defendant has failed to demonstrate that the notes sold on November 25 where the same notes it purchased on November 18. Although defendant may also be a victim of Wymer's securities fraud, it would be unjustly enriched if it could remedy its shortfall by retaining the funds Wymer misappropriated from the Iowa Trust. Equity demands that defendant return the property to its rightful owner, the Iowa Trust. Therefore, I conclude that plaintiff has more than met its burden of showing substantial likelihood of prevailing on the merits.

Defendant argues that (1) a constructive trust cannot be imposed where the subject property has been commingled, (2) a constructive trust cannot be imposed on a bona fide purchaser, and (3) the Uniform Commercial Code § 8–301(1) vests legal title to the property in defendant. None of these arguments have merit.

■ A constructive trust need not apply to a specific *res*. Rather, a successful constructive trust plaintiff wins an *in personam* order requiring the defendant to transfer a like value of property in some form to the plaintiff. *In re Marriage of Allen*, 724 P.2d at 657. Here, plaintiff has traced the proceeds from Wymer's sale of Iowa Trust's 1995 Notes to defendant. Thus, defendant received cash belonging to the Iowa Trust and a final judgment in this

action would merely require it to reconvey a like amount of cash to the plaintiff. The constructive trust doctrine simply does not require that the subject property be the same and, therefore, any commingling is irrelevant where, as here, plaintiff's tracing is established. *See, Id.*

Although a constructive trust cannot be imposed on a bona fide purchaser for value, *See, Id.*, as a matter of fact and law defendant is not a purchaser, bona fide or otherwise. Defendant paid no consideration for the assets traced to it from Iowa Trust. Defendant did purchase through Wymer similar notes on November 18. However, those notes were not the notes sold on November 25 and are not the subject of this lawsuit.

■ Finally, Colorado law is clear that a constructive trust can be imposed on a defendant who has legal title to the subject property, even when that defendant is innocent of any wrongdoing. *See, Page,* 592 P.2d at 798. Therefore, the Uniform Commercial Code is no defense here.

■ As to plaintiff's showing of irreparable injury, the mere size of the proposed constructive trust satisfies this element. Plaintiff seeks the return of more than $42.8 million which is more than one-fourth of defendant's total assets. It is clear that plaintiff may have difficulty satisfying his judgment if the funds are not set aside now. Therefore, he has shown irreparable injury. *See, Tri–State Generation & Transmission Assoc., Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir.1986); *Anthony v. Texaco, Inc.,* 803 F.2d 593, 599 (10th Cir.1986).

■ In determining whether the harm to plaintiff if the injunction does not issue outweighs the harm to defendant if it does issue, I must separate the harm to defendant caused by the mere existence of this action from the distinct harm that may be caused by a preliminary injunction. It is the temporary loss of *use* of the $42.8 million that is at issue now and not the permanent loss of these funds. If defendant wins on the merits, then these funds go back to it with interest.

Defendant's president testified that the bank could fail because declining depositor confidence in the bank could cause a run on the bank's assets. However, the loss of the bank's customer confidence stems from depositors' fear that it will ultimately lose on the merits rather than because $42.8 million is temporarily frozen.

Further, defendant's evidence of this risk was speculative. Defendant presented no testimony from federal regulators that they would allow the bank to fail if these funds are temporarily segregated. Rather, plaintiff presented evidence that federal banking regulations provide for emergency loans to defendant should the need arise. Moreover, the vast majority of defendant's depositors are protected by the Federal Deposit Insurance Fund.

Because defendant would lose investment flexibility if the $42.8 million is frozen in an escrow account, Grotjohn testified that the bank would earn less income on this asset. He estimated that this potential loss could rise to $1 million. However, this concern can be adequately addressed by plaintiff's posting a $1 million bond. On the other hand, the threatened harm to the Iowa Trust if these funds are not available should it win on the merits is manifest and severe.

Moreover, in balancing the equities here, I cannot help but consider that this preliminary injunction will merely accomplish the same freeze ordered by the California court. Defendant narrowly escaped that freeze only because Ronlov tipped Grotjohn to Wymer's impending collapse.

Finally, Iowa Trust's beneficiaries are all public entities. Much of the money invested by these entities directly benefits the public through the provision of essential services and public works. Additionally, some of the money invested in the trust represents pension funds of public employees. A preliminary injunction setting aside these funds is clearly in the public interest.

■ The essence of this preliminary injunction is to "freeze" for ultimate distribution the funds at issue. But for Ronlov's tip to Grotjohn on December 10, 1991, this

status would have obtained under the California court's freeze order. Consequently, this preliminary injunction is tantamount to preserving the status quo.

> The status quo is not defined by the parties' existing *legal rights;* it is defined by the *reality* of the existing status and relationship between the parties, regardless of whether the existing status and relationship may ultimately be found to be in accord or not in accord with the parties' legal rights.

*SCFC ILC, Inc.,* 936 F.2d at 1100. Here plaintiff's unbroken tracing of its property to defendant defines the reality of their status and relationship.

■ Defendant advanced no argument at the hearing on plaintiff's motion or in its papers that the relief requested is "disfavored" as (1) disruption of the status quo, (2) mandatory, or (3) affording substantially all the relief plaintiff may obtain following full trial on the merits. *See, Id.* at 1098–99. Such a preliminary injunction requires the movant to satisfy the heavy burden of showing that the four requisite factors weigh heavily and compellingly in the movant's favor. *Id.*

This injunction clearly does not afford plaintiff substantially all the relief he may obtain following trial because he does not have the use and possession of the funds which, if he does not prevail, will be returned with interest to defendant. To the extent this preliminary injunction may arguably be deemed disruptive of the status quo or mandatory, however, I conclude that plaintiff has met his heightened burden.

■ Under Rule 65, plaintiff must post a bond to ensure that adequate damages will be available to compensate defendant should it be determined that this injunction entered wrongfully. As I discussed above, the calculation of the amount of this bond must isolate only the potential harm caused by this injunction rather than possibility that defendant will lose on the merits. I conclude that a $1 million bond will ensure the availability of adequate damages to compensate defendant for the loss of use of the $42.8 million for four months until trial on April 27, 1992.

Accordingly, IT IS ORDERED THAT:

Plaintiff's motion for a preliminary injunction is GRANTED.

### APPENDIX 1

In the United States District Court

For the District of Colorado

Judge Lewis T. Babcock

Civil Action No. 91–B–2245

David J. Lyons, Commissioner of Insurance for the State of Iowa, and receiver for the Iowa Trust, Plaintiff,

v.

Jefferson Bank & Trust, a Colorado corporation, Defendant.

### PRELIMINARY INJUNCTION

In accordance with my ruling of January 22, 1992 entered on the record after full hearing, it is ORDERED that:

1. Jefferson Bank & Trust is prohibited from selling, dissipating, assigning, transferring, or otherwise affecting funds in the amount of $43,173,614.13, except in strict compliance with the additional express terms of this preliminary injunction;

2. Jefferson shall immediately deposit with the United Bank of Denver as escrow agent and trustee funds and securities in the amount of $43,173,614.13;

3. The United Bank of Denver shall segregate such funds and securities in a separate account and hold them in United States Treasury instruments or Federated's Trust of United States Treasury Obligations (TUSTO). Thereafter, the securities shall be reinvested in United States Treasuries with a maturity date of 90 days or less;

4. The United Bank of Denver shall maintain the account in conformity with this preliminary injunction and escrow agreement entered into among the parties and approved by the court on January 23, 1992 until the court orders otherwise;

5. The United Bank of Denver shall provide complete accountings to Jefferson and Lyons no less frequently than once every

month regarding the status of the account and otherwise make available to Jefferson and Lyons reasonable additional information regarding the account as they might request from time to time;

6. This preliminary injunction shall be effective against all officers, agents, servants, employees, and attorneys of Jefferson and all persons in active concert or participation with them;

7. This preliminary injunction shall be effective immediately upon the posting by Lyons and approval by this court of a bond in the amount of $1,000,000.00 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained;

8. The Escrow Agent and Trustee is hereby authorized to deduct its fees in accordance with Exhibit C to the escrow agreement from the initial deposit.

Dated in Denver, Colorado this 23rd day of January, 1992, nunc pro tunc to January 22, 1992 at 7:00 p.m. M.S.T.

BY THE COURT:

(s) Lewis T. Babcock
Lewis T. Babcock,
Judge

1534

# TRANSACTIONS
## November 25, 1991