Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 24, 2019

**2019 CO 62**

**No. 18SA284, *In re Feldman*—Slayer Statute—Preliminary Injunctive Relief.**

Feldman and the law firm of Haddon, Morgan & Foreman petitioned for relief
pursuant to C.A.R. 21 from an order of the probate court requiring the law firm to provide
information to the special administrator concerning its representation of Feldman in a
criminal prosecution for the murder of his wife, and to deposit funds held in its client
trust account into the registry of the court.  In response to the assertion of the special
administrator that Colorado's "slayer statute" applies to the funds at issue as proceeds of
the decedent's life insurance policy, the probate court determined that if Feldman were
later found, in the manner prescribed by the statute, to be the decedent's killer, he would
be ineligible to receive those proceeds.  Against that eventuality, the probate court found
that compelling the return of the unearned funds in the firm's client trust account would
be the only way to protect the children's interests, and that the court's equitable powers
permitted it to do so.

The supreme court issued a rule to show cause and now concludes that the probate
court abused its discretion by issuing its order without weighing the considerations
inherent in preliminarily enjoining the law firm from expending further funds in the

representation of Feldman. In addition, however, because the slayer statute expressly protects third parties who receive a payment in satisfaction of a legally enforceable obligation from being forced to return that payment or from liability for the amount of the payment, the supreme court determines that no finding of a reasonable likelihood of success in attempting to force the return of the insurance proceeds would have been possible. Given this resolution, the court further concludes that the disclosures ordered by the probate court would not serve their intended purpose.

The court therefore makes the rule to show cause absolute.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2019 CO 62

**Supreme Court Case No. 18SA284**
*Original Proceeding Pursuant to C.A.R. 21*
Denver Probate Court Case Nos. 18PR30274 & 18PR30656
Honorable Elizabeth D. Leith, Judge

**In Re**
**In the Matter of the Estate of**

Stacy Feldman, Decedent.

**Rule Made Absolute**
*en banc*
June 24, 2019

**Attorneys for Elizabeth Greenberg:**
Wade Ash Woods Hill & Farley, P.C.
Herbert E. Tucker
Jody J. Pilmer
    *Denver, Colorado*

**Attorneys for Special Administrator Melissa R. Schwartz:**
Gill & Ledbetter, LLP
Anne Whalen Gill
    *Castle Rock, Colorado*

**Attorneys for Robert Feldman:**
Lathrop Gage, LLP
Alison Z. Sheahen
    *Denver, Colorado*

**Attorneys for Haddon, Morgan and Foreman, P.C.:**
Haddon, Morgan and Foreman, P.C.
Jeffrey S. Pagliuca
David S. Kaplan
David G. Maxted
    *Denver, Colorado*

**CHIEF JUSTICE COATS** delivered the Opinion of the Court.

¶1 Feldman and the law firm of Haddon, Morgan & Foreman petitioned for relief pursuant to C.A.R. 21 from an order of the probate court requiring the law firm to provide information to the special administrator concerning its representation of Feldman in a criminal prosecution for the murder of his wife, and to deposit funds held in its client trust account into the registry of the court. In response to the assertion of the special administrator that Colorado's "slayer statute" applies to the funds at issue as proceeds of the decedent's life insurance policy, the probate court determined that if Feldman were later found, in the manner prescribed by the statute, to be the decedent's killer, he would be ineligible to receive those proceeds. Against that eventuality, the probate court found that compelling the return of the unearned funds in the firm's client trust account would be the only way to protect the children's interests, and that the court's equitable powers permitted it to do so.

¶2 We issued our rule to show cause and now conclude that the probate court abused its discretion by issuing its order without weighing the considerations inherent in preliminarily enjoining the law firm from expending further funds in the representation of Feldman. In addition, however, because the slayer statute expressly protects third parties who receive a payment in satisfaction of a legally enforceable obligation from being forced to return that payment or from liability for the amount of the payment, no finding of a reasonable likelihood of success in attempting to force the return of the insurance proceeds would have been possible. Given this resolution, the disclosures

3

ordered by the court would not serve their intended purpose. The rule is therefore made absolute.

## I.

¶3 As indicated in the probate court's order, Stacy Feldman died in 2015 and that same year her husband, Robert Feldman, received a disbursement of approximately $751,910 as the sole beneficiary of an insurance policy on the decedent's life. Almost three years after his wife's death, Feldman was charged with her murder. Pursuant to a fee agreement, he retained the law firm of Haddon, Morgan & Foreman to represent him in this criminal matter, and his retainer was deposited into the firm's client trust account.

¶4 Those trust account funds, the probate court found, were derived from the life insurance proceeds distributed to Feldman, and he intended to spend approximately $550,000 remaining from those proceeds to fund his criminal defense.

¶5 The record demonstrates that after criminal charges were filed against Feldman, Elizabeth Greenberg, as guardian for the Feldmans' two minor children, filed two petitions with the Denver probate court concerning the decedent's estate. The first petition asked for relief under Colorado's "slayer statute," § 15-11-803, C.R.S. (2018), and for a constructive trust, and the second petition requested the appointment of a special administrator.

¶6 The probate court then appointed a special administrator in both probate matters and granted her the authority to investigate and provide an inventory of the decedent's assets, pursue appropriate legal action on behalf of the decedent's estate, prevent further

4

dissipation of estate assets by Feldman, review Feldman's attorney billing statements and attorney fee agreements, and ascertain the amounts held in client trust accounts for Feldman.

¶7 As recounted by the probate court in its order, the special administrator then sent the law firm a letter requesting copies of Feldman's fee agreement, copies of attorney billing statements, and the balance of funds remaining in the firm's client trust account for Feldman. Additionally, the special administrator notified the law firm that she would be attempting to recover the life insurance proceeds paid to Feldman.

¶8 The parties filed various motions with the probate court concerning the special administrator's requests. After oral argument, the probate court issued an order requiring the law firm to (1) deposit the funds held in the firm's client trust account into the court's registry or another trust account set up by the special administrator, and (2) disclose information relating to its fee agreement with, and billing records to, Feldman and the amount and source of funds in the client trust account.

¶9 The probate court determined it could issue this order under authority of the slayer statute and its equitable powers to carry out that statute's intent. Without freezing those funds, the court reasoned a large portion, if not all, of the insurance proceeds would be spent on Feldman's legal defense, depriving his children of money that would belong to them if Feldman were later convicted of murdering his wife.

¶10 Feldman and the law firm petitioned this court for relief pursuant to C.A.R. 21, asserting that the probate court exceeded its authority and abused its discretion by

freezing the funds held in the client trust account and ordering disclosures. We issued a rule to show cause.

## II.

¶11 Exercise of our original jurisdiction under C.A.R. 21 is within our sole discretion. *Fognani v. Young*, 115 P.3d 1268, 1271 (Colo. 2005). An original proceeding under C.A.R. 21 is an extraordinary remedy that is limited in purpose and availability. *Wesp v. Everson*, 33 P.3d 191, 194 (Colo. 2001). It may be appropriate, however, to review an interlocutory order for an abuse of discretion when appellate review would be inadequate. *Smith v. Jeppsen*, 2012 CO 32, ¶ 6, 277 P.3d 224, 226.

¶12 In their petition, Feldman and the law firm assert that the probate court exceeded its jurisdiction and abused its discretion when it ordered the law firm to deposit the funds held in its client trust account in the court's registry pending a determination of whether its client, Feldman, killed his wife. Without access to those funds, they assert that Feldman will be unable to pay the firm's legal fees, the firm will have to withdraw from representing Feldman, and he will be deprived thereby of his legal counsel of choice for the serious criminal charges brought against him. Because appellate review would be inadequate to rectify an abuse of discretion under these circumstances, we conclude that exercise of our original jurisdiction is appropriate.

## III.

¶13 In *Lunsford v. Western States Life Insurance*, 908 P.2d 79, 83 (Colo. 1995), we addressed the scope of protection provided by a forerunner of Colorado's "slayer statute"

6

to insurance companies that paid life insurance proceeds to a primary beneficiary who was later determined to have murdered the insured. Finding that the statute was silent regarding a beneficiary's entitlement to insurance proceeds in situations other than those in which the beneficiary was determined, by the means prescribed by the statute itself, to have murdered the person upon whose life the policy was issued, we found the statute simply inapplicable to the question of insurance company liability in that case. *Id.* at 84–85. Unlike the question of liability for the distribution with which we were faced in *Lunsford*, the question before us in this original proceeding concerns the discretion of the probate court to freeze life insurance proceeds that had already been distributed to the primary beneficiary, until such time as a statutorily prescribed determination whether he was the killer of the insured could be made.

¶14 While the statute has been amended and no longer expressly provides for the disposition of proceeds of a life insurance policy, *see* § 15-11-803(3), C.R.S. (1987), it nevertheless currently provides for the revocation of any disposition of property made by the decedent to the killer in a governing instrument, and it continues to prescribe the means by which a felonious killing, for purposes of such revocation, must be established. *See* § 15-11-803(1)(b), (3)(a). The probate court specified in its order that if it should be proven under the provisions of the slayer statute that Feldman is the decedent's killer, that determination would make him ineligible to receive the insurance proceeds at issue in this case, and neither party appears to dispute that those insurance proceeds would qualify as a disposition as to which a felonious killing would require the revocation of

7

benefits by section 15-11-803(3). Although the statute makes a person who receives a payment to which that person is not entitled obligated to return the payment, § 15-11-803(9)(a), the statute does not expressly address the question of freezing insurance proceeds until it can be determined, according to the statute, whether the person receiving the payment was entitled to receive it or not.

¶15 As the probate court below noted in issuing its order, probate courts in Colorado enjoy equitable jurisdiction in addition to the authority granted to them under particular provisions of the Probate Code. *Beren v. Beren*, 2015 CO 29, ¶ 19, 349 P.3d 233, 241. But "equity jurisdiction" in this sense has never been equated with a roving commission to do good. *See* 1 Dan B. Dobbs, *Law of Remedies* § 2.2 (2d ed. 1993) (tracing the development of equity jurisdiction). Rather, it more accurately refers to a court's powers derived from the body of equity precedent, doctrine, and practices attributable to the equity courts of old. *See id.* § 2.1(3). More specifically, we have characterized the equity jurisdiction of Colorado's probate courts as limited to those powers the probate court "traditionally exercised before adoption of the Probate Code" and only then if that exercise of equity has not been "displaced" by particular provisions of the Code. *Beren*, ¶ 19, 349 P.3d at 241. The Probate Code displaces a court's general equitable authority "when an exercise of equity conflicts with the plain language of that specific provision and the two cannot be reconciled." *Id.* at ¶ 21, 349 P.3d at 241.

¶16 Notwithstanding other formal or procedural limitations, the probate court therefore clearly has the jurisdiction to impose established equitable remedies, whether

or not those powers have been expressly granted to the probate court in its enabling legislation. No more than any other court, however, is the probate court relieved of exercising its discretion according to the limitations that have developed for the imposition of such equitable remedies. However designated, the probate court's order here, compelling the law firm, as it does, to deposit in the court registry the funds remaining in the firm's client trust account, necessarily implicates the equitable remedies of constructive trust, as well as preliminary injunction.

¶17    Generally, a constructive trust is an equitable device used to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs. *In re Marriage of Allen*, 724 P.2d 651, 656–57 (Colo. 1986). And although assets subject to a constructive trust may be frozen under some circumstances to preserve the corpus of the constructive trust pending trial on the merits, *see* 2 Dan B. Dobbs, *Law of Remedies* § 6.1(5) (2d ed. 1993), enjoining the holder from access to its property in this way necessarily implicates the balance of equities required for a preliminary injunction, *see, e.g., Lyons v. Jefferson Bank & Tr.*, 781 F. Supp. 1525, 1530–31 (D. Colo. 1992) (applying test for granting a preliminary injunction to freeze assets claimed under a constructive trust); *Wilty v. Prudential Ins. Co. of Am.*, 2018 WL 7019197, at *1–2 (W.D. Tenn. Sept. 25, 2018) (applying test for granting temporary restraining order to freeze already-disbursed funds claimed under a constructive trust and state slayer statutes). Among the other concerns we have identified as prerequisites to preliminarily enjoining someone is a reasonable

9

likelihood of the moving party's success on the merits. *Rathke v. MacFarlane*, 648 P.2d 648, 653 (Colo. 1982).

¶18 In much the same way a constructive trust "cannot operate against a third party who acquired the property in good faith, for value, and without notice," *In re Marriage of Allen*, 724 P.2d at 657, Colorado's slayer statute protects bona fide purchasers for value from disgorgement or liability, *see* § 15-11-803(9)(a). In addition, however, it similarly protects a person "who receives a payment or other item of property in partial or full satisfaction of a legally enforceable obligation" from being compelled to return that payment or from being liable for its amount. *Id.* The language of this provision plainly applies to the funds held in the law firm's client trust account and thereby protects those funds from disgorgement.

¶19 When the law firm accepted Feldman's payment, it did so in exchange for undertaking one or more "legally enforceable obligation[s]" within the meaning of section 15-11-803(9)(a). By agreeing to represent Feldman, the law firm became obligated to uphold all the duties attendant upon an attorney in an attorney-client relationship in addition to its obligations arising under the express and implied terms of its fee agreement with Feldman. *See* Restatement (Third) of the Law Governing Lawyers § 55 (Am. Law Inst. 2019) (describing an attorney's liability under theories of tort, contract, and breach of fiduciary duty stemming from the attorney-client relationship); 23 Richard A. Lord, *Williston on Contracts* § 62:5 (4th ed. 2019) (stating that agreements between

attorneys and clients concerning the attorney-client relationship are enforceable and should generally be treated as any other contract).

¶20 Greenberg and the special administrator maintain that section 15-11-803(9)(a) is inapplicable because the firm has not yet "received" those funds within the meaning of that provision. They point out that those funds are being held in trust for Feldman and have not yet been earned by the law firm. But in ordinary parlance "receive" merely means "to come into possession of," *see receive*, Merriam-Webster's Online Dictionary, https://perma.cc/434N-QZQ6, which the law firm indisputably has done with regard to these funds, *see* Colo. RPC 1.15A(a) (treating client trust account funds as being "in the lawyer's possession").

¶21 Where the probate court's order assumes, and the parties do not dispute, that the funds held in the client trust account represent a disposition of property covered by section 15-11-803(3), *cf*. § 15-11-803(6) (providing for a "wrongful acquisition of property or interest by a killer not covered by this section"), they also fall within the ambit of section 15-11-803(9)(a)'s protection. As such, even if Feldman is ultimately proven to be a killer within the contemplation of the statute, the statute will not obligate the firm to return the funds or render the firm liable for their expenditure, but rather the firm may continue to earn those funds in accordance with their fee agreement. The special administrator therefore can have no reasonable likelihood of succeeding in recouping those funds covered by the statute for the benefit of the decedent's estate and its rightful heirs.

## IV.

¶22 The probate court's order also required the law firm to disclose information relating to its fee agreement with, and billing records to, Feldman and the amount and source of funds in the client trust account. This information would have allowed the court to determine the amount of funds already earned by the firm and therefore exempt from the freeze order.

¶23 Because the probate court could not freeze any of the funds held in the trust account, however, those disclosures would not serve their intended purpose, and it is unnecessary for the firm to now make them.

## V.

¶24 The probate court abused its discretion by issuing its order without weighing the considerations inherent in preliminarily enjoining the law firm from expending further funds in the representation of Feldman, and because the slayer statute expressly protects third parties who receive a payment in satisfaction of a legally enforceable obligation from being forced to return that payment or from liability for the amount of the payment, no finding of a reasonable likelihood of success in attempting to force the return of the insurance proceeds would have been possible. Given this resolution, the disclosures ordered by the court would not serve their intended purpose. The rule is therefore made absolute.