## NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, INC., Plaintiff,

v.

## KANSAS CHAPTER, National Electrical Contractors Association, Inc.,; Jim Mlynek, in his capacity as agent for defendant Kansas Chapter and in his individual capacity; and Gary Anderson, in his capacity as agent for defendant Kansas Chapter and in his individual capacity, Defendants.

### No. 99–4023–RDR.

United States District Court,
D. Kansas.

April 16, 1999.

K. Gary Sebelius, Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Topeka, KS, Anessa Abrams, Henry A. Platt, Gary L Lieber, Schmeltzer, Aptaker & Shepard, Washington, DC, for National

Electrical Contractors Association, Inc., plaintiff.

Byron J. Beck, Robert A. West, Morrison & Hecker L.L.P., Kansas City, MO, Kristine A. Larscheid, Fisher, Patterson, Sayler & Smith, Topeka, KS, for The Kansas Chapter of the National Electrical Contractors Association, Inc., defendant.

### MEMORANDUM AND ORDER

ROGERS, Senior District Judge.

This is a declaratory judgment action based upon diversity jurisdiction brought by the National Electrical Contractors Association, Inc. (NECA), a national trade association, against one of its local chapters, the Kansas Chapter, National Electrical Contractors Association, Inc. (Chapter or Kansas Chapter), and two of the Chapter's agents, its president and its manager. In this action, NECA seeks an order of the court declaring that the defendant Kansas Chapter is subject to its authority to place the Chapter into sponsorship pursuant to NECA's bylaws. In the instant motion, NECA seeks injunctive relief preventing the defendants from interfering with the operation of the Kansas Chapter by NECA. Specifically, NECA requests that the defendants be enjoined from (1) interfering with NECA's access to the Kansas Chapter's offices, books, records, bank accounts, and any other property; (2) scheduling and/or conducting any Board of Directors meetings or membership meetings without the express written approval of NECA; and (3) transacting or attempting to transact any financial business concerning the Kansas Chapter.

The court has conducted a lengthy hearing on the instant motion. During that hearing, the court allowed both sides to present considerable evidence and argument on the issues presented in this case. The court is now prepared to issue findings of fact and conclusions of law. The court shall provide an extensive review of the facts in this case so that the positions of the parties can be fully understood.

Nevertheless, the court does not intend to resolve many of the issues and questions raised by the parties during the hearing and during the course of these proceedings. The court is concerned in this opinion only with whether the plaintiff is entitled to injunctive relief. The court does not believe it necessary or appropriate to address many of the issues that separate the parties. For example, the parties, and in particular the defendants, have raised a number of issues concerning corporate law and the application of Kansas law to the procedures used by the individual defendants in conducting the operations of the Kansas Chapter. The court intends to note these conflicts, but we shall not resolve them. Such matters must be resolved at another time in another forum. With that caveat, the court shall proceed to the findings of fact and conclusions of law.

### FINDINGS OF FACT

1. NECA is an incorporated trade association consisting of members who are engaged in the business of performing electrical construction work. NECA is organized under a national constitution and bylaws which govern all of its members. NECA charters chapters throughout the country. There are 118 NECA chapters. Each chapter is separately incorporated and generally runs its own affairs. Each chapter hires its own professional and clerical staffs. Contractors may belong to one or more chapters if they have multiple places of business. The purpose of NECA is to represent, promote and advance the interests of the electrical construction industry. The various chapters of NECA also act as multiemployer bargaining agents for the negotiation of collective bargaining agreements with local unions of the International Brotherhood of Electrical Workers (IBEW). Local chapters are assigned territories throughout the country which coincide with the jurisdiction of one or more of the IBEW locals.

2. In 1944, a charter from NECA was issued to the Kansas chapter. In 1949, the

Kansas chapter incorporated. At that time, this chapter was designated as the "Kansas Chapter, National Electrical Contractors Association." Another chapter in Kansas was formed in 1972. This chapter was designated as the "North Kansas Chapter, National Electrical Contractors Association, Inc." In 1993 the chapters were merged. The Kansas Chapter was deemed to be the surviving entity. Although the Chapter requested that NECA issue a new charter after the merger, no new charter was actually issued and the old charter was never revoked.

3. The 1949 Articles of Incorporation of the Kansas Chapter state, inter alia: "This Corporation is organized not for profit and the objects and purposes to be transacted and carried on are ... to increase and stabilize the membership of National Electrical Contractors Association, and to cooperate in general with said National Association, conducting all activities in accord with its Constitution." The Articles further provide that to qualify for membership in the Kansas Chapter, contractors must also be members of NECA.

4. The Kansas Chapter Bylaws provide as follows:

> That any and every resolution hereafter adopted or motion hereafter carried by this Chapter or a committee hereof, which is contrary to the Constitution or tenets of the National Electrical Contractors Association, Inc. or in the opinion of counsel, is contrary to law, shall be for all purposes treated as null and void, and any and all action taken under any such resolution or motion shall be also for all purposes treated as null and void.

5. Article I of NECA's Constitution incorporates its Bylaws by reference. It states: "[NECA] shall be governed under this Constitution ... and by subsidiary bylaws designated the 'Bylaws' adopted simultaneously herewith (and as amended from time to time in accordance with the provisions thereof) which Bylaws shall not be in conflict with the provisions of the Constitution."

6. The Kansas Chapter has been a chartered chapter since 1944. Since that time, it has continuously held itself out as a Chapter of NECA. The Chapter has continued to use the name "NECA" in its name; has sent a representative to the NECA Board of Governors; and collected NECA's portion of members' dues and submitted them to NECA. At NECA's national conventions, the Kansas Chapter's Governor has submitted proposals on behalf of the Chapter and has done so as recently as 1997.

7. James Mlynek, President of O.K. Electric Company, was elected President of the Kansas Chapter for a two-year term in 1997. Gary Anderson was appointed manager of the Chapter in March 1995.

8. In March 1997, the President of the IBEW transferred four counties in Kansas—Miami, Linn, Leavenworth and Johnson (the "disputed counties")—from the jurisdiction of IBEW # 226 to the jurisdiction of IBEW # 124. These counties in the past had been part of the collective bargaining agreement the Kansas Chapter had with IBEW # 226. Under the new arrangement, the counties would be included in the collective bargaining agreement the Kansas City Chapter of NECA had with IBEW # 124. The Kansas Chapter protested this action to the IBEW and to NECA. Subsequently, NECA took the position that the counties would be transferred from the territory of the Kansas Chapter to the territory of the Kansas City Chapter effective September 1, 1997. NECA believed that it had no right to dispute the IBEW decision.

9. On July 14, 1997, the Kansas Chapter Board of Directors voted to file charges with the National Labor Relations Board regarding the transfer of the disputed counties. The NLRB later refused to issue a complaint, finding insufficient evidence that the jurisdictional change repudiated the collective bargaining agree-

ment between the Kansas Chapter and IBEW # 226.

10. A new collective bargaining agreement between the Kansas Chapter and IBEW # 226 was executed for the period from September 1, 1997 to August 31, 1999 with no change in territory. The disputed counties continued to be included.

11. On October 10, 1997, the Kansas Chapter Board of Directors voted to pursue litigation over the disputed counties.

12. On January 14, 1998, the trustees (those representing management and those representing the union) of the International Brotherhood of Electrical Workers Apprenticeship and Journeyman Training Fund deadlocked on the issue of whether contributions should be collected from contractors performing work in the disputed counties. The matter was thereafter submitted to arbitration. The arbitrator ultimately ruled that, in accordance with the position of the management trustees, a lawsuit should be initiated to collect the delinquent contributions to the trust fund.

13. On August 12, 1998, at a meeting of the Kansas Chapter, some members raised concerns about pursuing the disputed counties matter. Douglas L. Hague, President of Shelley Electric, Inc. and Treasurer of the Kansas Chapter, was concerned about the rising legal expenses. The members voted to increase the budget for this litigation to $50,000.

14. Following the meeting on August 12th, Hague contacted NECA officials. He was concerned that Mlynek and others were not interested in following NECA's directives. Hague asked David Roberts, Executive Director of the Southern Region of NECA, to come to a membership meeting to discuss the situation with the members.

15. On August 20, 1998, NECA, through John Grau, Executive Vice–President and Chief Executive officer, wrote the Kansas Chapter informing it that it had no approved charter or chapter bylaws. Grau

sought to motivate the Chapter to submit approved bylaws to NECA. The letter reviewed the prior history of this issue:

On January 29, 1997, your chapter submitted bylaws for approval. On April 1, 1997, a letter from the Secretary–Treasurer Thompson returned those bylaws for correction. To date, the corrected bylaws have not been resubmitted for approval. During the interim, that original letter has been reviewed and found to be incomplete. A revised letter (with today's date) is enclosed for your action and resubmission. A sample charter application is also enclosed.

To assure full recognition of your chapter representatives at the upcoming NECA National Convention and Board of Governors meeting in Las Vegas, please contact David Roberts immediately to expedite some workable solution to this situation.

16. On October 2, 1998, the union trustees of the trust fund filed an action against the management trustees in the Kansas City division of the United States District Court for the District of Kansas to vacate the arbitrator's decision.

17. In early October 1998, Richard Landers, the Kansas Chapter Governor, met with NECA officials concerning the failure of the Kansas Chapter to pass approved bylaws. NECA officials warned him that he would not be seated at the national NECA convention unless the Chapter proceeded to approve the bylaws.

18. On October 5, 1998, the Kansas Chapter held a membership meeting. Roberts attended the meeting representing NECA. He informed the members that it was necessary for the Chapter to approve the bylaws as suggested by NECA. The members were not receptive to the statements made by Roberts. Prior to his speech, the members had heard from the attorneys who were representing them in the disputed counties litigation. The information provided by their counsel spurred several of the members to reject the ef-

forts of Roberts. These were the same members who were upset by NECA's failure to intervene and assist the Chapter on the disputed counties matter. The members made no effort to further the approval of the bylaws at that meeting.

19. Some members of the Kansas Chapter became concerned about the inability of the Chapter to comply with the wishes of NECA. D.L. Smith, President of D.L. Smith Electrical Construction, Inc., and Hague believed that a special meeting was necessary in order to resolve this problem. On October 9, 1998, Landers sent a notice to all Chapter members that a special meeting would be held on October 13, 1998 to discuss the current litigation and the seating of the Chapter Governor at the National Convention.

20. On October 9, 1998, Mlynek sent a memo to the membership indicating that a meeting would not be held on October 13th because the notice sent by Landers was not in compliance with Kansas Chapter bylaws. Mlynek noted that the next meeting would be held on November 6th.

21. On October 12, 1998, Hague sent a letter on his behalf and the behalf of five other members of the Kansas Chapter to Mlynek requesting that a meeting be held on October 23, 1998.

22. On October 15, 1998, NECA sent a letter to Landers indicating that he would not be seated at future national conventions unless the Kansas Chapter submitted approvable bylaws by December 31, 1998.

23. On October 16, 1998, Mlynek did schedule a special membership meeting for October 27, 1998 and canceled the meeting scheduled for November 6th.

24. NECA ultimately allowed Landers to be seated at the national NECA convention in October after he assured them that the proposed bylaws would be passed by the Kansas Chapter.

25. During the months of October through December, the problems in the Kansas Chapter began to increase. Factions began to develop concerning the disputed counties issue. Anderson acknowledged that both sides began to use the Chapter's Bylaws as both a shield and a sword. One group led by Smith, Hague and Landers became concerned about the leadership exhibited by Mlynek and Anderson. They were concerned that meetings were not being called when they requested them. They were also disturbed by the litigation fees that were mounting on the disputed counties issues. Finally, they were upset by the failure of the Chapter to approve the bylaws as requested by NECA.

26. On October 27, 1998, at the special meeting, the Kansas Chapter discussed the litigation concerning the disputed counties. By this time, the majority of the members of the Chapter were in favor of ending the dispute concerning the four counties. Mlynek, Anderson and others, however, remained opposed to the jurisdictional change. The membership voted to draft bylaws that would bring them into compliance with NECA's requirements and recommendations. The membership specifically approved the revision that would exclude the disputed counties. They voted to have the revisions prepared so that they could be voted on at the December meeting. Finally, the membership voted to incur no further legal expenses with regard to the litigation over the disputed counties. By this time, a majority of the members of the Chapter had decided that they wanted to maintain good relations with NECA.

27. On December 18, 1998, the Kansas Chapter conducted its annual election of officers. It was at this meeting that the turmoil and dissension that plagued the Chapter reached its peak. Mlynek indicated that by the time of this meeting the members of the Chapter were "shoving the Bylaws up [his] nose." Prior to the meeting, he had sought legal advice on the issue of member voting. A discussion occurred prior to the election concerning the number of votes that Shelley Electric

would be allowed to cast. Mlynek ruled that Shelley Electric would only be allowed to cast one vote. This was contrary to prior meetings where Shelley Electric had been allowed two votes because they had two offices in the area of the Kansas Chapter's jurisdiction, each in a separate wage earning area. This decision caused some outrage during the meeting. The voting resulted in a tie for the positions of President, Vice–President and Governor. Only one office, Treasurer, was filled. The Board of Directors decided to hold another election in sixty days. The membership voted to seek a sixty-day extension from NECA to submit the bylaws revisions. They also voted to appoint a committee to consider the revisions to the bylaws.

28. On December 24, 1998, Grau wrote Mlynek informing him that he had received a complaint from Shelley Electric concerning voting procedures used at the recent election. Grau notified Mlynek that the complaint would be investigated.

29. On December 28, 1998, Mlynek notified the members by memorandum that a letter had been sent to NECA requesting an extension for submitting the bylaws; that a committee had been appointed to revise the bylaws; and that the new election of officers would take place on February 18, 1999.

30. On or about January 4, 1999, NECA Executive Vice–President Grau received sponsorship petitions signed by eleven contractor members of the Kansas Chapter. At the time, the Kansas Chapter had twenty-one members in good standing.

31. The body of the petitions for sponsorship stated as follows:

In accordance with Article III, Section 7 of the NECA National Bylaws, the following members of the Kansas Chapter, NECA request that the NECA Executive Committee sponsor this Chapter. We find that our Chapter is unable to function adequately due to internal dissention (sic) and need the help of the National Association.

32. Article III, Section 7 of the NECA Bylaws read as follows:

A "Sponsored Chapter" may be established (subject to the requirements hereinafter set forth) when one or more of the following situations is found by the Executive Committee to exist:

(a) when a local group of electrical contractors finds itself unable to organize effectively,

(b) When the charter of a NECA Chapter has been revoked,

(c) When forty (40%) percent or more of the membership of an existing chapter, or Division thereof, certifies in writing to the Executive Committee that the Chapter is not functioning adequately by reason of internal dissension.

The requirements to be met prior to the sponsorship of a Chapter are:

(a) Written approval from the chartered Chapter or chapters in whose geographical jurisdiction the sponsored Chapter is to be organized. The Executive Committee shall not alter the geographical territory of any chartered Chapter solely for the purpose of permitting the affiliation of a sponsored Chapter with jurisdiction over the same class of business within said geographical territory.

(b) Written approval from the District Vice President in whose district the Sponsored Chapter is to be organized.

(c) Approval of the Executive Committee.

33. Upon receipt of a petition for sponsorship based upon internal dissension, NECA accepts the allegations as true and does not conduct an investigation. Nevertheless, NECA officials were aware of problems that existed in the Kansas Chapter. On or about January 11, 1999, the NECA Executive Committee authorized Ben Cook, District Vice–President, and Grau to establish the sponsorship. By letter dated January 19, 1999, Cook approved the sponsorship. On that date,

NECA drafted Articles of Sponsorship which were signed by Grau. The Articles of Sponsorship made the following findings:

That the Kansas Chapter, pursuant to the terms of the Kansas Chapter Bylaws, is subject to the Constitution, Bylaws, Rules and Regulations of the National Association.

That the Request for Sponsorship submitted by members of the Kansas Chapter is properly submitted in accordance with Article III of the National Bylaws and is subscribed by and represents more than Forty Percent (40%) of the membership of the Kansas Chapter.

That the Kansas Chapter is not functioning adequately due to internal dissension.

That the conditions for sponsorship as provided for in Article III of the National Bylaws have been met in all respects.

That it is in the best interests of the National Association and the Kansas Chapter that the Kansas Chapter become a "Sponsored Chapter" and maintained by the direct action, control or participation of the National Association in matters over which the Kansas Chapter otherwise would have autonomous control.

34. The Articles of Sponsorship established a term of sponsorship for a period of one year commencing January 19, 1999 and ending January 18, 2000, "subject to termination at an earlier date as determined by the Executive Committee of the National Association." The Articles indicated that NECA would have control over the affairs of the Kansas Chapter during the period of the sponsorship.

35. On January 15, 1999, Mlynek sent a memorandum to the membership indicating that the next meeting would occur on January 27, 1999 in Wichita, Kansas. Mlynek stated:

Following the membership meeting, NECA Southern Region Director David Roberts and an attorney representing National NECA will be joining us to discuss the request for National NECA sponsorship.

36. By letter dated January 19th, Grau advised all members of the Kansas Chapter that the request for sponsorship had been approved. He further advised the members that an informational membership meeting would be held at 2:00 p.m. on January 27, 1999 in Topeka.

37. On January 25, 1999, Mlynek sent a memorandum to the Chapter membership concerning the sponsorship of the Chapter. The animosity and dissension that existed in the Chapter was reflected in this memo. Mlynek noted that NECA had scheduled a meeting for January 27th in Topeka contrary to the previous plans to conduct a meeting in Wichita on that date. Mlynek explained the conflict in part as follows:

Apparently, National NECA has been in bed with the IBEW for so long they have forgotten who is who. The Kansas Chapter is not a "local union" of National NECA. National NECA has no more legal ability to take over the Kansas Chapter than they do to take over your company. We are a Kansas corporation, duly incorporated under the laws of Kansas. We operate under a set of bylaws adopted by our membership. Those bylaws provide no mechanism for turning over control of the Chapter to any outside entity. Rest assured you, the members, through your elected officers and board of directors, continue to manage this Chapter. I, as President, continue to oversee the operations of the Chapter between meetings. I have received a legal opinion from our attorney that National NECA's actions in attempting to take over the Chapter are completely illegal, null and void. You should therefore disregard Robert's letter of January 20, 1999. *The membership meeting will take place on January 27th in Wichita at Joe Kelly's restaurant beginning at 11 a.m. pursuant to the notice from me dated January 15, 1999.* At that time we will explain why

National NECA's action is completely illegal, null and void. I encourage all members to attend. The offer for representatives of National NECA to join us at 1 p.m. remains.

Furthermore, after speaking with a number of you, I do not believe those promoting the petition truly have a majority of members who wish to have the chapter sponsored. It is the nearly unanimous opinion of the membership that National NECA participated in the planning and execution of the takeover of Johnson, Leavenworth, Miami, and Linn counties for the sole benefit of a large national contractor and to the detriment of the Kansas Chapter and its members. No one doubts that National NECA's actions on the heels of our arbitration win represent an attempt to divide the Chapter and bully us into dropping our fight to have our agreement enforced. Clearly, National NECA has increasingly become interested in serving only large national contractors and large IBEW locals at the expense of mid-size and smaller contractors and smaller Locals. Why, then, would we (a chapter of small and mid-size contractors) want to turn over the chapter to those who it is agreed have no interest in what is best for us? The answer can only be so that National NECA and their agents can rule without accountability. Clearly, there isn't anything a majority of members couldn't accomplish if they wanted to. If those desiring sponsorship are the majority, they don't need to turn the Chapter over to National NECA, they simply need to show up at a meeting and vote to send the Chapter in whatever direction they desire. This sponsorship action isn't about democracy or what is in the best interest of the Chapter. It's about running off trustees who they haven't been able to coerce into breaching their fiduciary duty.

38. On January 26, 1999, Roberts issued a letter to the members of the Kansas Chapter that responded to the issues raised by Mlynek in his memorandum of January 25th. Roberts stated:

The purpose of this memorandum is to briefly respond to some of the points raised by Jim Mlynek in his memorandum of January 25.

First, there will be a meeting at 2:00 p.m. at the Holiday Inn West in Topeka, Kansas on January 27, 1999. The meeting which Mr Mlynek claims was agreed to for Wichita was never finalized. In any case, since the Chapter is now under sponsorship, it is not within Mr. Mlynek's authority to dictate when and where a Chapter meeting will take place.

I will be joined at the meeting in Topeka by NECA Vice President Ben Cook and Gary Lieber, National NECA's labor counsel. Together, we will explain the basis for sponsorship and what National NECA hopes to accomplish so that the period of sponsorship will be brief. While this will be discussed in detail at the meeting, a few points should be mentioned given the comments and tone of Mr. Mlynek's memo.

1. This is not a "takeover" by National NECA. We have no interest in running the day-to-day affairs of the Chapter except as may be necessary to resolve the issues which led to your request for sponsorship.

2. The sponsorship occurred because more than 40% of the members petitioned for it in accordance with the National NECA bylaws, which state that Chapter sponsorship will occur: "When forty (40%) percent or more of the membership of an existing chapter or Division thereof, certifies in writing to the Executive Committee that the Chapter is not functioning adequately due to internal dissension."

3. Our counsel has advised us that there is no basis for Mr. Mlynek's assertion that the sponsorship is illegal. Please note that while Mr. Mlynek said it was illegal and that he had

such a legal opinion, he did not explain this legal opinion or state in any way how the establishment of temporary authority over the Chapter by NECA, which is entirely consistent with both NECA's bylaws and the Chapter's governing documents, is illegal.

This sponsorship is temporary and will end as soon as NECA is satisfied that the internal dissension that has detrimentally affected the Chapter and its members has disappeared.

39. On January 27, 1999, two meetings were held. Mlynek held a meeting in Wichita at which seven members were in attendance. The members at that meeting determined that the officers who presently held office would remain in office. The members also voted to direct the Board of Directors to bring the procedures for writing checks in compliance with the Chapter bylaws. These members voted to have two of the following officers countersign all checks that were written by the Secretary–Manager: President, Vice–President, Treasurer, or Secretary–Manager. The members further voted to allow each member of the Chapter only one vote. Following that meeting, Mlynek conducted a Board of Directors meeting without notice to all of the members of the Board. During that meeting, the Board passed a resolution revoking all prior authorizations to sign or countersign checks, make drafts, transfers or withdrawals. The Board further decreed that any two of the following individuals were the only ones who could sign or countersign any checks, make drafts, transfers or withdrawals from the accounts of the Kansas Chapter: Mlynek, President; Clifford Flowers, Vice–President; Hague, Treasurer; and Anderson, Secretary.

40. Representatives of NECA and other members of the Kansas Chapter held a meeting in Topeka to explain sponsorship. After the meeting concluded, NECA's representatives and counsel drove to the Chapter's Topeka office where they were met by Mlynek and Anderson. Roberts advised Anderson that he was suspended with pay pending further determination as to his status. Anderson was instructed to return all of NECA's property in his possession. Anderson refused. Mlynek and Anderson refused to recognize the validity of the sponsorship.

41. On January 28, 1999, Mlynek made appointments to the Apprenticeship and Journeyman Training Fund and the IBEW # 226 Pension Trust Fund. He appointed Gary Anderson to the Training Fund and Flowers and himself to the Pension Trust Fund.

42. On January 28, 1999, Hague received a telephone call from the Chapter's bank that Mlynek and Anderson were attempting to change the approved signatures for writing checks. Hague learned that the authority for writing checks had been removed from two individuals. Hague was completely unaware of the actions that had been taken by the Board of Directors.

43. On January 28, 1999, at least eleven members of the Chapter sent letters to Mlynek informing him that each one of them supported sponsorship by NECA.

44. On February 8, 1999, plaintiff filed the instant action.

45. On February 12, 1999, the court granted plaintiff's motion for temporary restraining order.

46. On March 1, 1999, the Kansas Chapter, under the sponsorship of NECA, conducted an election. At that time, members voted eleven to four for D.L. Smith over Mlynek for President of the Chapter.

**CONCLUSIONS OF LAW**

1. The standards applicable to motions for preliminary injunction are well-established. The court may grant a preliminary injunction if the party seeking it shows: (1) substantial likelihood of prevailing on the merits; (2) irreparable harm in the absence of the injunction; (3) proof that the threatened harm outweighs any damage the injunction may cause to the

party opposing it; and (4) that the injunction, if issued, will not be adverse to the public interest. *Sprint Spectrum v. State Corporation Comm.*, 149 F.3d 1058, 1060 (10th Cir.1998). Where the movant is asking for a mandatory injunction, altering the status quo, the movant's claims must be "compelling." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098–99 (10th Cir.1991). However, under either a regular or heightened standard, where the first three requirements are satisfied, the Tenth Circuit has defined the fourth requirement by lowering the bar, stating, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Tri–State Generation and Transmission Assoc., Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 358 (10th Cir. 1986).

2. Plaintiff is subject to the heightened standard because it is seeking to alter the status quo in this case. Thus, plaintiff is required to demonstrate that the factors supporting injunctive relief "weigh heavily and compellingly in the movant's favor." Plaintiff has the burden to establish by clear and unequivocal proof its right to a preliminary injunction. *Penn v. San Juan Hospital*, 528 F.2d 1181, 1185 (10th Cir.1975); *Wilson v. Bruce*, 816 F.Supp. 679 (D.Kan.1993). The grant or denial of a preliminary injunction rests within the sound discretion of the trial court. *Tri–State Generation*, 805 F.2d at 354; *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 557 (10th Cir.1984).

3. The court is persuaded that the plaintiff has demonstrated by clear and unequivocal proof that it is entitled to injunctive relief in this case. Initially, the court notes that plaintiff has shown with compelling evidence that it will likely prevail on the merits in this case. The evidence presently before the court shows that NECA had the authority to implement the sponsorship, the sponsorship was duly requested by over 40% of the Chapter's membership, NECA properly implemented the sponsorship in accordance with its Constitution and Bylaws, and defendants Mlynek and Anderson, in their individual capacities and as agents of the Chapter, failed and refused to recognize sponsorship and have actively interfered with its implementation.

4. The defendants raised several arguments as to why they believe that NECA has no authority to sponsor the Kansas Chapter. The court does not find that the facts or the law support any of them. The court finds that most of the arguments were strained efforts to avoid sponsorship. The arguments were, in the judgement of the court, very technical and quite often separated from reality. The court shall address them briefly in order to show their lack of merit.

5. First, the defendants suggest that NECA had no authority to sponsor the Kansas Chapter because the Kansas Chapter was not a chartered chapter of NECA. This argument is based primarily upon the letter that Grau wrote to Gary Anderson on August 20, 1998 in which he stated that "the Kansas Chapter has no approved charter nor an approved set of chapter bylaws." Second, they contend that NECA cannot rely upon the provisions of the NECA Bylaws for sponsorship because the Kansas Chapter has never adopted the NECA Bylaws. Third, they contend that the sponsorship is invalid because NECA failed to follow its own Bylaws in imposing a sponsorship upon the Kansas Chapter. They suggest that, contrary to NECA Bylaws, NECA failed to get the written approval of the Chapter prior to sponsorship.

6. The court is persuaded by compelling evidence that the Kansas Chapter is a valid chapter of NECA. In 1944, a charter was issued by NECA to the Kansas Chapter. In 1972, an additional chapter was created in Kansas. In 1993, the two chapters merged and the original Kansas chapter was deemed the surviving entity. Al-

though the Chapter requested that NECA issue a new charter after the merger, no new charter was actually issued, and the old charter was never actually revoked. The testimony presented at the hearing demonstrated the prior charter had never been revoked. Even if the charter had been revoked, the court is not convinced that fact would have any impact here. The Chapter is bound to NECA's Constitution and Bylaws through its Articles of Incorporation and Bylaws regardless of whether it has a valid charter in effect. If a charter is revoked, the members of the chapter are nevertheless "entitled to continue as members or associate members of the National Association subject to all the provisions of the Constitution and Bylaws of the National Association." Those provisions include the right of the members to petition for sponsorship under Article III, section 7 of the Bylaws. Finally, the court believes that the Chapter is equitably estopped from claiming that it is not a Chapter of NECA. The Kansas Chapter has held itself out as a chapter of NECA for 55 years. During this period, it has used the name NECA in its name, sent a representative to the NECA Board of Governors, submitted proposals on behalf of the Chapter, and collected NECA dues and submitted them. The suggestion by the defendants that the Kansas Chapter is not a chapter of NECA is wholly frivolous.

7. The defendants have also argued that NECA cannot rely upon the provisions of the NECA Bylaws for sponsorship because the Kansas Chapter has never adopted the NECA Bylaws. The court also finds this contention without merit. The Kansas Chapter long ago agreed to abide by the NECA Constitution. The NECA Constitution clearly states that NECA shall be governed "under this Constitution (as amended from time to time in accordance with the provisions hereof) ... and by subsidiary bylaws designated the 'Bylaws' adopted simultaneously herewith (and as amended from time to time in accordance with the provisions thereof) which Bylaws shall not be in conflict with the provisions of the Constitution." The suggestion by the defendants that the Kansas Chapter somehow agreed to abide by the NECA Constitution but not the Bylaws appears ludicrous. To the extent that the Bylaws are not in conflict with the Constitution, and defendants make no such argument, the Kansas Chapter is bound by the terms of the Bylaws as well as the Constitution.

8. The defendants have also vaguely suggested that certain votes or actions that were taken during the events that led up to this litigation and after it began were invalid or tainted due to certain irregularities. This is one of those issues that the court does not intend to directly confront. The defendants have failed to demonstrate how they were prejudiced by the alleged irregularities. In each instance, the position contrary to that of the individual defendants had more than enough support or votes to accomplish its goal even without the votes questioned by the individual defendants. For example, even if the members that the individual defendants challenged in the filing of the sponsorship petition were excluded, there were still more than 40 percent of the Kansas Chapter that sought sponsorship. Or, during the election on March 1, 1999, even if the companies that were challenged by the individual defendants were eliminated, the vote was still in favor of D.L. Smith for President.

9. Finally, the defendants contend the sponsorship is invalid because NECA failed to follow its own Bylaws in imposing a sponsorship upon the Kansas Chapter. The defendants assert that NECA failed to obtain written approval from the Kansas Chapter under Article III, Section 7 of the NECA Bylaws prior to the imposition of sponsorship. Plaintiff has argued that this requirement only applies when the sponsored chapter is being carved out of a preexisting chapter. We agree. A review of the Article III, Section 7 of the NECA Bylaws reveals that sponsorship can be

implemented in three situations: (1) when a local group of electrical contractors finds itself unable to organize effectively; (2) when the charter of a NECA Chapter has been revoked; and (3) when forty percent or more of the membership of an existing Chapter certifies in writing to the Executive Committee of NECA that the Chapter is not functioning adequately by reason of internal dissension. NECA has established certain requirements that must be met prior to the sponsorship of a Chapter. The first requirement, the one noted by the defendants in support of this argument, is obviously not designed for use when sponsorship is based upon internal dissension. The language of this requirement indicates that its use is solely for the situation where NECA seeks to sponsor a Chapter in an area where a Chapter already exists. We find no merit to the defendants suggestion that it applies to the situation that occurred in this case.

10. In sum, the court finds that the plaintiff has demonstrated by compelling evidence that it will likely prevail on the merits in this case.

██ 11. The court is also persuaded that the plaintiff will suffer irreparable harm if the requested injunctive relief is not granted. The court finds that NECA does not have an adequate remedy at law. The court finds that defendants' conduct has created turmoil in the Chapter. This turmoil, unless enjoined, will undoubtedly harm NECA's relationship with the Chapter and its members. In recent months, the Chapter has been forced to deal with seemingly endless disputes, some petty and some of importance. Various factions have developed within the Chapter, and they have produced disputes that have made functioning extremely difficult. The members of the Chapter have a strong interest in preserving the benefits of their association with NECA and in resolving these disputes which threaten to do lasting damage to the Chapter. NECA has a substantial interest in bringing order to one of its chapters and in ensuring that the wishes of the majority of the membership are realized. NECA also has an interest in seeing that its chapters follow the requirements of its Constitution and Bylaws. NECA's reputation would be damaged if one chapter can disregard the clear requirements of being a chapter or act with disregard to the interests of the majority of its members. Finally, the requested relief will serve to protect the Chapter's assets. The actions by the defendants in attempting to manipulate the bank account of the Chapter were curious at best. While the court is not persuaded that the defendants' efforts to change the check writing procedures on the Chapter's bank account were an effort to improperly spend any of the Chapter's monies, the court is troubled by the secrecy that surrounded the defendants' actions. These actions were taken after Mlynek had been advised of the sponsorship and without any notice to the Chapter's Board of Directors. Although purportedly executed at a Board of Directors meeting, the action was taken without notice to other members of the Board of Directors, both before and after the meeting.

12. The court also believes that the threatened injury to NECA outweighs whatever damage the proposed injunction may cause the defendants. As suggested previously, NECA and its members may suffer considerable damage if the injunction is not granted. The court is not persuaded that the Chapter will suffer any significant harm. The only possible harm is the temporary loss of autonomous control. Even construing the loss of control as harmful is doubtful under the circumstances that are presented here. The recent election held by the Chapter suggests that the members no longer wish to be led by defendant Mlynek and his associates. The movement for sponsorship now commands the majority of the members of the Kansas Chapter. Moreover, the nature of the sponsorship is temporary. Pursuant to the Articles of Sponsorship, the sponsorship will last no longer than a year.

The court also notes that the Articles of Sponsorship prohibit NECA from taking any action that the Chapter could not take in its own right.

13. The court also does not find that the granting of the injunction will be adverse to the public interest. The balance of the public interest in fact weighs in favor of the plaintiff. The requested injunction will improve the operation of the Kansas Chapter and promote the relationship between NECA and the Kansas Chapter.

14. In sum, the court shall grant plaintiff's motion for preliminary injunction.

**IT IS THEREFORE ORDERED** that plaintiff's motion for preliminary injunction (Doc. # 10) be hereby granted.

**IT IS FURTHER ORDERED** that the defendants Kansas Chapter, its officers, agents, representatives, employees, and members; James Mlynek; and Gary Anderson; and all others in active concert or participation with the defendants are hereby enjoined from the following activities: (1) interfering in any way with the operation of the Kansas Chapter by the National Electrical Contractors Association, Inc. (NECA); (2) interfering with NECA's access to the Kansas Chapter's offices, books, records, bank accounts and any other property; (3) scheduling and/or conducting any Board of Directors meetings or membership meetings without the express written approval of David Roberts, NECA Executive Director of Southern Region; and (4) transacting or attempting to transact any financial business concerning the Kansas Chapter, including with respect to any of its committees.

**IT IS FURTHER ORDERED** that the defendants Kansas Chapter, its officers, agents, representatives, employees, and members; James Mlynek; and Gary Anderson; and all others in active concert or participation with the defendants shall affirmatively: (1) cooperate with Roberts and his staff during the period of injunctive relief with respect to any reasonable request they make regarding the Kansas Chapter or its operations; and (2) otherwise comply in all respects with the Articles of Sponsorship adopted by NECA.

**IT IS FURTHER ORDERED** that the previous bond in the amount of $10,000.00 filed by the plaintiff shall remain in effect during the period of this injunctive relief.

**IT IS SO ORDERED.**