XEROX CORPORATION, a New York corporation, Plaintiff,

v.

HEWLETT–PACKARD COMPANY, a Delaware corporation, and Anderson Industries, Inc., d/b/a Pioneer Cable Company, a Kansas corporation, Defendants.

No. 99–1291–JTM.

United States District Court, D. Kansas.

Aug. 13, 1999.

Joseph P. Lavelle, Robert A. Auchter, William D. Belanger, Howrey & Simon, Washington, DC, Michael G. Norris, Timothy S. Davidson, Norris & Keplinger, L.L.C., Overland Park, KS, for Xerox Corporation, plaintiff.

Jay F. Fowler, Jim H. Goering, Foulston & Siefkin L.L.P., Wichita, KS, Morgan Chu, Irell & Manella LLP, Los Angeles, CA, for Hewlett-Packard Co., Defendant.

Christopher A. McElgunn, Todd E. Shadid, Klenda, Mitchell, Austerman & Zuercher, L.L.C., Wichita, KS, for Anderson Industries Inc., Defendant.

### MEMORANDUM ORDER

MARTEN, District Judge

The matter currently before the court in the dispute over rights to 4000 DPT–300 chips used in the manufacture of computer printers is the motion for preliminary in-

junction sought by plaintiff Xerox. Defendant Anderson Industries, doing business as Pioneer Cable, has filed motions seeking either a stay of the present matter, or a transfer of the action to the United States District Court for the District of Idaho, where other litigation between Xerox, Pioneer, and defendant Hewlett–Packard (HP) is currently pending.

On August 12, 1999, the court conducted a hearing in which the parties presented argument related to the various pending motions. All parties have previously submitted documentary evidence, affidavits, and argument on the issues raised by these motions. For the reasons stated at the hearing of the present matter, and as further stated herein, the court grants the motion for preliminary injunction as to the 4000 chips currently under order, while denying it as to any request for an entitlement to chips in future purchase orders. The court will deny the motion to stay, but grant the motion to transfer.

### Findings of Fact

In March and April of 1999, Xerox entered into contracts with Pioneer for the delivery of 5000 DPT–300 chips, to be used in the production of Xerox printers. Around June 10, 1999, Xerox revised these orders to 4000 chips, to be shipped July 1, 1999. Pioneer accepted this revision.

Xerox and HP had previously entered into a Licensing Agreement, under which Xerox became a licensed user of HP technology. Under the Licensing Agreement, Xerox was obligated to pay royalties on printers containing HP's technology. Section 3.01 of the Agreement provided:

> Xerox shall pay HP a royalty for Tsavorite color printers which incorporate the TrueRes ASIC and the Licensed Hardware and Software. Royalties shall accrue on each Tsavorite product at the time it is sold, leased, invoiced, or otherwise delivered or transferred by Xerox to or on behalf of a customer, whichever occurs first.

The Agreement also provided that Xerox would make periodic reports on printer production:

> On or before the expiration of forty five (45) days from the end of each calendar quarter, Xerox will furnish to HP a written report setting forth in reasonable detail (for example, by model or catalog designation) its production of each type of printer during the preceding quarter and its calculation of the royalties accrued with respect to such production.

(Agreement, at § 3.02).

The provisions for termination of the Agreement are contained in Article 8. The Agreement there provided:

### Article 8– Term and Termination

8.01 **Term.** The term of this Agreement shall be for as long as the product described in Section 2.01 is sold or leased. This Agreement shall terminate on notification by Xerox to HP that it does not intend to launch the designated product with the Licensed Hardware and Software, in which event Xerox will return to HP all information, equipment, prototypes, etc. in its possession.

8.02 **Termination.** Either party may terminate this Agreement effective upon written notice of termination to the other party in any of the following events:

> (a) the other party materially breaches this Agreement and such breach remains uncured for thirty (30) days following written notice of the breach by the terminating party; or

> (b) a petition for relief under any bankruptcy legislation is filed by or against the other party, or the other party makes an assignment for the benefit of creditors, or a receiver is appointed for all or a substantial part of the other party's assets, and such petition, assignment, or appointment is not dismissed or vacated within thirty (30) days.

8.03 **Termination by Xerox.** Xerox may terminate this Agreement effective

upon written notice of termination to HP upon the following events:

(a) HP does not timely meet acceptance criteria due to non-conformance to specifications pursuant to Article 4.04.

(b) Xerox may terminate any time prior to Product Launch upon notice to HP.

**8.04  Termination by HP.** HP may terminate this Agreement effective upon written notice of termination to Xerox upon the following events:

(a) HP may terminate this Agreement upon the failure of Xerox to pay any royalties or other form of compensation due under this Agreement within 30 days of the date such payment was due.

(b) HP may terminate this Agreement by giving written notice if Xerox has not paid minimum royalties of at least $25,000 for any continuous period of 12 months starting on the date of the first sale.

**8.05  Survival.** Upon the expiration or any termination of this Agreement for any reason except breach caused by non-payment by Xerox under Section 8.04(a), Xerox Companies, or any of them, may continue, subject to any royalty obligations, to distribute then existing Licensed Hardware and Software and shall retain the right to use source code and documentation to support Xerox products which incorporate the Licensed Hardware and Software. Further, the general, confidentiality, payment and reporting provisions of this Agreement shall, to the extent applicable, survive the expiration or any termination hereof.

The Agreement included a "lock-box" provision, under which Xerox, up until January 1, 1999, would send royalties and royalty reports to an agent of HP. Royalties and reports would be sent directly to HP only after that date.

According to affidavits from HP personnel, the company began to suspect that Xerox was failing to make the quarterly reports required by the Agreement, and employed PricewaterhouseCoopers LLP ("PWC") to conduct an audit of Xerox's performance. According to affidavits submitted by PWC auditors, Xerox failed to promptly respond to PWC's requests, and that Xerox's delays resulted in an increase of $20,000 to $25,000 in the cost of the audit. (Horler Decl., at ¶ 6). Specifically, PWC cited Xerox's Total Satisfaction Guarantee ("TSG") Program, under which the company sent replacement printers to customers with defective products. Ousman Jobe of PWC calculated that, in a certain percentage of cases, replacement printers were shipped without the original being returned to Xerox, thereby resulting "in a situation in which ... two printers thus were potentially in use." (Jobe Decl. at ¶ 8). Jobe calculated that $33,140 in royalty payments would be due for units shipped under the TSG Program from 1996 through September 30, 1998. Jobe also cited Xerox's Trial Program, under which printers were sent to certain customers for a 60–day trial as a potential royalty event.

On April 13, 1999, Robert C. Mayes wrote to Xerox giving notice that it had materially breached the Agreement. Mayes wrote:

The accounting firm of PricewaterhouseCoopers LLP ("PWC") recently conducted an audit of Xerox's books and records on behalf of HP pursuant to Section 3.03 of the Agreement. This audit has revealed that Xerox is failing to pay HP royalties accrued under Section 3.01 of the Agreement "on each Tsavorite product at the time it is sold, leased, invoiced, or otherwise delivered or transferred by Xerox to or on behalf of a customer, whichever occurs first."

In particular, under Section 3.01, a royalty accrues on each Tsavorite product transferred by Xerox to a customer pursuant to a program such as the Xe-

rox Total Satisfaction Guarantee ("TSG") Program. Xerox has failed to pay HP royalties due under the TSG program, pursuant to Section 3.01, of $33,401 for the period of June 1, 1997—September 30, 1998. The limited information provided to HP by Xerox regarding fourth quarter 1998 sales shows that Xerox has failed to pay HP royalties due under the TSG program of $3,946.07 for the period of October 1, 1998—December 31, 1998.

Furthermore, HP has learned that Xerox provides trial shipments of printers to corporate customers for up to 60 days. Under Section 3.01 of the Agreement, a royalty is due HP on each trial shipment of printers to corporate customers, regardless of whether such trial shipments subsequently result in a final sale.

In addition, Xerox has failed to provide royalty reports to HP in accordance with Section 3.02 of the Agreement. Under Section 3.02, Xerox is required to "furnish to HP a written report setting forth in reasonable detail (for example, by model or catalog designation) its production of each type of printer during the preceding quarter and its calculation of the royalties accrued with respect to such production." The letter dated February 9, 1999 from Mr. G.B. Baheti of Xerox to HP, for example, while claiming to constitute a royalty report for fourth quarter 1998, fails to provide the detailed information required under Section 3.02.

This letter does not in any way limit or affect any rights, remedies, or defenses available to HP, all of which are expressly reserved.

At the same time, HP sent Xerox a "Notice of Intent to Commence Dispute Resolution Process." (Def.Decl.Exh. F). The Notice repeated the concerns expressed in Mayes's letter, and pursuant to Section 10.14 of the Agreement, requested "a meeting between business executives of HP and Xerox who have been personally involved in the events leading up to this dispute . . . . as soon as possible . . . ." (Id.) Both the Mayes letter and the Notice of Intent were sent by Certified Mail to Xerox on April 15, and records show they were both signed for by Xerox personnel on April 19.

Xerox responded to Mayes's letter by a letter dated May 17, 1999 from Timothy Costello. Costello wrote that Xerox was investigating the alleged breaches, and asked for a copy of the PWC audit "[t]o facilitate [this] review." (Def.Decl.Exh. H). Costello wrote that Xerox "in good faith and without admitting it has breached its obligations under the Agreement in any manner, has elected to forward a check to HP under separate cover in the amount of $37,347.07, which is the total amount claimed in your correspondence of April 13, 1999." (Id.) With respect to the allegedly inadequate royalty reports, Costello asked HP to identify the defective reports and "advise how it believes each such report fails to meet said requirements." (Id.)

On May 20, 1999, Mayes again wrote to Xerox, giving notice that HP terminated the Agreement due to "material and uncured breaches." (Def.Decl.Exh. I). Mayes wrote that HP had given notice of material breaches "[p]ursuant to Sections 8.02 and 10.05 of the Agreement," and that Xerox had failed to cure its breaches within 30 days as provided by Section 8.02. "Accordingly," Mayes wrote, "pursuant to Section 8.02, HP hereby terminates the Agreement." (Id.)

HP and Pioneer had entered into a Manufacturer's Representative Agreement (MRA) in 1996. Contrary to the suggestions of HP, the MRA contains no provisions which provide that licensee status was a condition precedent for delivery of contracted goods. That is, the MRA contains no provision justifying the termination of purchase orders previously accepted by Pioneer. To the contrary, the MRA provides that Pioneer, not HP, has

the responsibility for delivery after an order has been accepted. (MRA, at § 3.4).

### Conclusions of Law

■■■ The Tenth Circuit summarized the rules relating to preliminary injunctions in *SCFC ILC. Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098–99 (10th Cir.1991) (footnotes omitted):

In order to obtain preliminary injunctive relief, the moving party must establish:

(1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.

*Otero Savings and Loan Ass'n [v. Federal Reserve Bank]*, 665 F.2d 275, 278 (10th Cir.1981) (citations and quotations omitted). As a preliminary injunction is an extraordinary remedy, *see GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir.1984), the right to relief must be clear and unequivocal. *See Penn v. San Juan Hosp.*, 528 F.2d 1181, 1185 (10th Cir.1975); *Matzke v. Block*, 542 F.Supp. 1107, 1112–13 (D.Kan.1982). *See generally* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948, at 428–29 & nn. 19–21 (1973 & Supp.1991) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (footnotes omitted)).

■■■ The court must reject the argument advanced by Pioneer and HP that the present case exemplifies the type of disfavored forms of injunctive relief which require proof heavily and compellingly in movant's favor. The injunction, narrowed as here to the 4000 chips reflected in purchase orders previously accepted by Pioneer, does not award Xerox all of the relief it seeks in the present action. Further, since the chips are reflected in currently existing Purchase Orders and the chips are effectively ready for delivery to Xerox, the injunction granted herein is essentially prohibitory rather than mandatory—it simply prohibits Pioneer from refusing to do what it has otherwise agreed to do. Finally, the court further believes that, given that those Purchase Orders were voluntarily accepted by Pioneer, and that all the circumstances present in the case demonstrate that Pioneer would have gone forward with the delivery of the chips but for the actions of HP, enforcing the contracts reflected in the Purchase Orders serves to support rather than alter the status quo.

■■■ As noted in the hearing on the present matter, the court finds Xerox has submitted evidence which clearly demonstrates that (1) failure to deliver the chips would cause it irreparable injury, (2) enforcing the Agreement will not under the circumstances of the case work any significant injury to HP or Pioneer, and (3) the public interest supports the enforcement of the purchase orders and the awarding of the injunction. Similarly, the court also finds that Xerox has demonstrated a substantial likelihood that it will prevail on the merits of the action. The court finds that the MRA between HP and Pioneer did not give any right to Pioneer to refuse delivery of the chips, once it had previously agreed to their shipment.

The court notes that, in its brief in opposition to the injunction, HP does not argue that termination of the Agreement was justified on the grounds of a failure to cure the unpaid royalties under the TSG program. Instead, it cites as uncured material breaches the allegedly inadequate royalty reports, and the failure to pay royalties on the Trial Program.

HP stresses the failure of Xerox to respond, in Costello's letter, to HP's concerns about the royalties allegedly due

from the 60–day Trial Program. The PWC audit showed $8,000 in potential royalties outstanding for units on trial in January of 1999. HP then speculates, given the 27–month existence of the Agreement, that it has lost out on up to $108,000 in royalties under the Trial Program. The court finds no support for concluding that the Trial Program printers provided a basis for refusing to deliver the contracted-for chips. At the time of the termination of the Licensing Agreement, HP had expressed two concerns about missed royalties through Mayes' letter in April: that royalties were due and unpaid under the TSG and under the Trial Programs. The amount of allegedly unpaid royalties under the TSG program was nearly five times as that under the Trial Program, and Mayes's letter contained a specific figure only for the TSG Program Royalty. Xerox paid that amount in full, and there was no reason for HP to think that Xerox would not also be willing to make appropriate payments on any amounts due under the Trial Program. There is no evidence unpaid royalties under the Trial Program represented a significant breaking of the Licensing Agreement.[1]

The court has no doubt that Xerox failed to fully comply with the Licensing Agreement as to the submission of royalty reports. Nonetheless, the court finds nothing in the agreements among the parties which would translate this fact into an entitlement for HP or Pioneer to disregard agreements previously entered into for the purchase of chips with HP technology. Once the Purchase Orders for the 4000 chips were accepted by Pioneer, any dis-

pute about the quality of the royalty reports does not affect Xerox's right to the contracted-for chips.

■ As noted earlier, HP terminated the Licensing Agreement pursuant only to Section 8.02 (termination on material breach), and not 8.04(a) (termination on failure to pay royalties). Section 8.05 provides:

8.05 **Survival.** Upon the expiration or any termination of this Agreement for any reason except breach caused by non-payment by Xerox under Section 8.04(a), Xerox Companies, or any of them, may continue, subject to any royalty obligations, to distribute then existing Licensed Hardware and Software and shall retain the right to use source code and documentation to support Xerox products which incorporate the Licensed Hardware and Software. Further, the general, confidentiality, payment and reporting provisions of this Agreement shall, to the extent applicable, survive the expiration or any termination hereof.

This section would have little meaning if, as HP suggests, it entitles Xerox only to keep chips currently in its possession. Rather, the court finds that the only reasonable construction of § 8.05 under the circumstances of the case is that it creates a surviving right to chips which Xerox either physically possesses, or to those chips for which it has entered into a binding contract of sale.[2]

The court hereby grants the preliminary injunction, but only as to the 4000 chips described herein. Xerox shall post a bond in the amount of $250,000.00. Immediate-

1. At the hearing on the present matter, counsel for Xerox submitted a proffer—unobjected to by any of the defendants—that an investigation of the Trial Program found that only 108 printers had been shipped under the program without royalties being sent to HP. Xerox has represented that royalties for these printers have been sent to HP.

2. HP also argues that, under KSA 84–2–401, Section 8.05 is unimportant and gave Xerox no interest in the disputed chips, since "title never passed from Pioneer." (Resp. at 16).

KSA 84–2–401 does provide that "title" to goods does not pass until they have been specifically identified to the contract, but the commentary to the provision shows it does not resolve the issue in itself. The Official UCC Comment provides that 2–401 "in no way alters the rights of either the buyer, seller or third parties declared elsewhere in the Article." The Kansas Comment takes the same position: under Article 2 "title to goods is irrelevant to issues among the buyer, seller, and third parties."

ly upon the posting of such bond, Pioneer shall deliver the chips to Xerox.

The court has reviewed Pioneer's motions to transfer or stay. In light of the emergency nature of the motion for injunctive relief, the court finds no grounds for staying the matter. However, in light of all of the circumstances present in the case, the absence of any close Kansas connection (aside from the presence of the DPT–300 chips) to the dispute between the parties, and in light of ongoing litigation among the parties in the United States District Court for the District of Idaho, the defendant Pioneer's motion to transfer will be granted under 28 U.S.C. § 1404(a).

IT IS ACCORDINGLY ORDERED this 12th day of August, 1999, that the plaintiff's motion for leave (Dkt. No. 43) is denied, while its motion for preliminary injunction (Dkt. No. 3) is granted as provided herein; defendant Anderson Industries' motion to stay (Dkt. No. 26–2) is denied, while its motion to transfer (Dkt. No. 26–1) is granted.