**DOMINION VIDEO SATELLITE, INC., Plaintiff,**

v.

**ECHOSTAR SATELLITE CORPORATION, and Echosphere Corporation, Defendants.**

No. CIV.A. 03–K–607.

United States District Court, D. Colorado.

July 9, 2003.

**1208**

uses its Federal Communications Commission (FCC) license to operate a television-programming network known as "Sky Angel." Sky Angel is a Christian-religious network broadcasting predominantly Christian theme programming. Defendants EchoStar Satellite Corporation and Echosphere Corporation (collectively "EchoStar") operate a direct broadcast satellite (DBS) system that includes several satellites currently in orbit and operates its DBS service under the trade name "DISH Network."

Dominion and EchoStar have been parties since 1996 to a leasing contract entitled "Direct Broadcast Service Transponder Lease, Channel Use and Programming Agreement" (the "Agreement"). By the Agreement's terms, EchoStar leases eight transponders on EchoStar's 61.5 degree orbit satellite to Dominion and Dominion, in turn, subleases back to EchoStar six of its frequencies together with FCC license rights, which permits EchoStar to use those six frequencies for its own broadcasting.

Allan L. Hale, Hale, Hackstaff, Friesen, LLP, Denver, CO, for plaintiff.

Todd A. Jansen, Cockrell, Quinn & Creighton, Denver, CO, Terrance Wade Welch, Ross William Wooten, Courtney L. Tigner, T. Wade, Welch & Associates, Houston, TX, for defendants.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

KANE, Senior District Judge.

Dominion Video Satellite, Inc. ("Dominion") is a broadcast satellite operator that

This is the second time these same parties have been before me in litigation arising under the Agreement which, it should be noted, includes a broad provision requiring the arbitration of such disputes. In the first action, 01–K–206, I affirmed a December 2001 Interim Award of Arbitration Panel, as clarified by written rulings issued in February 2002, which focused on EchoStar's efforts to recoup from Dominion-only programming subscribers losses stemming from having extended equipment "subsidies" to them as part of EchoStar's overall marketing strategy to secure business for its subscription services.[1]

---

**1.** I note the 2001 case, like this one, began as a motion for preliminary injunction in which Dominion asked me to enjoin EchoStar from pursuing various of its recoupment strategies against Dominion-only subscribers, contend-

ing those practices violated the Agreement. I granted Dominion's motion, enjoining EchoStar from collecting certain fees or engaging in various recoupment practices pending arbitration. EchoStar appealed, and the Tenth

The instant action involves an entirely different aspect of the Agreement, namely, whether EchoStar's acceptance of applications by FamilyNet and Daystar channels to broadcast their programming on EchoStar transponders violates Article VIII of the Agreement related to programming exclusivity (the "exclusivity provisions") and, if so, whether such violation is actionable or preempted by applicable federal law. Dominion contends EchoStar's actions violate the parties' agreement that the programming carried by Dominion and EchoStar be "mutually exclusive," namely, that Dominion is entitled exclusively to transmit "Christian Programs" to both Dominion and EchoStar subscribers and that EchoStar is entitled to transmit all other types of programming. Dominion seeks a declaration of the parties' rights and responsibilities under the Agreement and preliminary and permanent injunctive relief.

I conducted a hearing on June 24, 25, and 26. Following the hearing the parties submitted several briefs and motions (some as recently as yesterday afternoon) in addition to the written summations and proposed findings of fact and conclusions of law I requested. After considering the pleadings on file, the evidence taken at the hearing, the written briefs and the parties' separate proposed findings of fact and conclusions of law, I make the following findings of fact and conclusions of law and order in memorandum opinion form.

EchoStar denies FamilyNet is a "Christian Program" as that term is defined in the Agreement and, citing provisions of the Federal Communication Act (FCA) requiring direct broadcast satellite (DBS)

providers to reserve at least 4% of their channel capacity "exclusively for noncommercial programming of an educational or informational nature," 47 U.S.C. § 335(b)(1), contends federal law preempts the Agreement with respect to the broadcasting of competing Christian programming and renders its broadcast of Daystar not actionable.

I agree with Dominion that EchoStar's position is disingenuous. Overall I conclude that (1) Dominion's position on the Motion for Preliminary Injunction is favorable but (2) the relief requested is inappropriate given the parties' agreement to arbitrate disputes arising under the Agreement. Accordingly, I grant the Motion for Preliminary Injunction and refer the matter for arbitration (Dominion's alternative request). I retain jurisdiction to monitor proceedings pending arbitration.

## I. LEGAL STANDARD.

Under *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980), the movant must establish the following in order to obtain a preliminary injunction:

- That the movant will suffer irreparable injury unless the injunction issues;

- That the threatened injury to the movant outweighs whatever damages the proposed injunction may cause the opposing party;

- A showing that the injunction, if issued, would not be adverse to the public interest; and

- A substantial likelihood that the movant will eventually prevail on the merits.

Circuit affirmed but remanded the case for findings in support of the $10,000 bond I had imposed to secure the preliminary injunction. In the interim, however, the arbitration had been held and within days of the Tenth Circuit's mandate, the arbitration panel issued its award. As a result, a remand for findings to support the preliminary injunction bond amount became a hearing on cross-motions to confirm (Dominion) and partially to vacate (EchoStar) the arbitration award. After a lengthy hearing, I denied EchoStar's Motion and affirmed the Award.

If the movant satisfies the first three of these requirements, it may establish the final "likelihood of success on the merits" requirement by showing questions "so serious, substantial, difficult and doubtful as to make the issues ripe for litigation and deserving of more deliberative investigation." *Walmer v. United States Dep't of Defense*, 52 F.3d 851, 854 (10th Cir.1995).

If I enter an order granting an injunction, I must set forth the reasons for issuance in specific terms, and not by reference to the complaint or other document, and must describe in reasonable detail the acts or acts that are enjoined. Fed. R.Civ.P. 65(d). Typically, any injunction issued must also provide for "the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c).

In this case, however, the Agreement includes a provision explicitly recognizing that the "rights and benefits" of each of the parties under the Agreement are "unique" and that "no adequate remedy exists at law if any of the parties shall fail to perform, or breaches, any of its obligations." Agreement § 12.3.1. Accordingly, the Agreement specifically provides that either party may "obtain an order or decree of specific performance, or a preliminary or permanent injunction [to enforce those rights] *(without the necessity of posting or filing a bond or other security)*." *Id.* (emphasis added). As discussed further below, this unique contractual language impacts my application of this legal standard in several respects.

 Certain types of preliminary injunctions are so disfavored that the movant must satisfy an even heavier burden before they may be issued. *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098–99 (10th Cir.1991). These include

preliminary injunctions that (1) disturb the status quo ante; (2) that are mandatory rather than prohibitory; or (3) that afford the movant "substantially all the relief [it] may recover at the conclusion of a full trial on the merits." *Id.* To prevail where the requested injunction falls into one or more of the disfavored categories, the movant must show that, "on balance," the four *Lundgrin* factors "weigh heavily and compellingly" in its favor. *SCFC ILC*, 936 F.2d at 1099. "The burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits." *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir.1984).

 In this case, EchoStar argues that the preliminary injunction sought falls into all three of the disfavored categories and urges me to deny it as an "extraordinarily" drastic remedy under the circumstances. EchoStar contends Dominion has been "sitting" on its rights under the exclusivity provisions for two years and should not be allowed to unwind agreements between EchoStar and third-parties FamilyNet and Daystar now that they have gone into effect. This characterization, too, is disingenuous as EchoStar had only been broadcasting FamilyNet and Daystar for four months when Dominion filed the instant lawsuit. EchoStar acknowledges Dominion was attempting to negotiate a resolution before the broadcasts commenced, but suggests Dominion should have rushed to the courthouse rather than "sit on its rights" in that manner. It is beyond cavil that parties should be encouraged to settle their differences without recourse to litigation. Based on the record to date, these parties need more, not less, encouragement in this regard.

I agree with Dominion that the lower standard for prohibitory, rather than man-

datory, injunctions applies. The status quo *ante* is the state of affairs that existed *before* EchoStar granted FamilyNet and Daystar space on its satellite so ordering EchoStar temporarily to drop FamilyNet and Daystar is a return to the status quo *ante*. Because it is temporary, rather than permanent, the injunction does not give Dominion "everything" it would get after a formal resolution of the dispute on its merits. Firmly established public policy favoring arbitration suggests that arbitration itself is one of the essential items bargained for that awaits a final resolution of the dispute.

## II. DISCUSSION.

■ As a preliminary matter, I note Dominion's contention throughout its briefing that EchoStar's actions violate both the parties' leasing Agreement *and* the arbitration Award overreaches. The 2001 Award barely mentions the subject exclusivity provisions, and when it does, it is on an aspect of their application having nothing to do with the leasing of transponder space by EchoStar to Christian programmers other than Dominion. Of the nine issues referred for arbitration, only one

mentioned the violation of exclusivity rights, *see* Interim Award, pp. 2–3, and the panel's summary (and, in my opinion, uncritical) conclusions reveal the issue to have had nothing to do with the position being taken by Dominion in the instant case.[2] What EchoStar is doing by leasing space to FamilyNet and Daystar may subject it to liability for violating the Agreement's exclusivity provisions, but it does not "violate" the 2001 Award. Accordingly, Dominion's contention that it is entitled to a preliminary injunction to "enforce" the arbitration Award is inaccurate and rejected. The more accurate statement is that Dominion seeks a preliminary injunction not to "enforce" the 2001 Award, but to prevent any further accrual of irreparable harm associated with EchoStar's violation of the Agreement's exclusivity provisions by providing transponder space to Christian channel Sky Angel competitors.

### A. *Preliminary Findings of Fact.*

Both parties to this litigation are engaged in the business of providing direct broadcast satellite (DBS) television programming to subscribing customers who

**2.** The sum total of the panel's comments on the question of whether either party "violated the rights of the other with respect to the provisions of the Agreement relating to exclusive programming rights" reads as follows:

> We understand the parties agree that when evaluating the programming of an entire channel, the appropriate test is whether the predominant theme of the overall programming of the channel is Christian as defined in Article VIII. The occasional non Christian program on a predominantly Christian channel does not violate Dominion's obligation to broadcast [sic] exclusively Christian programming. Likewise, the occasional Christian program on a predominantly secular channel does not violate Dominion's exclusivity rights. The evidence does not allow us to define "Channel" in any precise way, but the parties seemed to have a common understanding of the term and

this award confirms the above agreement or understanding of the parties.
> The area of disagreement is related to the carve out of "religiously oriented business television programming" in Section 8.4(c). Dominion contends that this exception relates to the content of the program and allows sending of non Christian programming to a Christian audience but does not allow sending of Christian programming to any audience [sic]. EchoStar contends that this exception relates to the market, and does not limit their right to broadcast Christian content to private networks, encrypted markets, pay per view. We agree with Dominion's interpretation of Section 8.4(c). 8.4(d) obviously provides a carve out which can be used if either is unable or unwilling to carry programming to which they have the exclusive right.

Interim Order at 6–7. Neither subsection 8.4(c) or (d) is at issue in this case.

use parabolic satellite antennas and DISH brand receiving equipment in order to receive either companies' television programming. EchoStar owns the DBS network and operates it under the DISH tradename. Dominion owns a DBS network operating under the tradename "Sky Angel" and leases eight satellite transponders from EchoStar.

Sky Angel is devoted to programming Christian religious content. It broadcasts 20 Christian-religious television channels and 16 similar radio channels. Dominion's aim is to establish a satellite distribution platform for Christian-religious programming that does not rely on commercial secular television for access by Christian television ministries controlled by Christians and free from secular (i.e., non-religious) control or influence. It does not charge a fee to programmers who broadcast on Sky Angel, but requires them to promote Sky Angel in order to increase Dominion's subscriber base, which is its primary revenue source.

EchoStar's DISH Network broadcasts almost every available television program genre, including news, sports, drama, variety, movies, children's, religious, educational and informational. More than 500 channels of programming, contained in several program packages, as well as special programming for business customers and pay-per-view events are broadcast by EchoStar.

Dominion is licensed by the Federal Communications Commission (FCC) to transmit a DBS signal from eight satellite transponders located at the 61.5 degree orbital location. EchoStar owns a satellite located at the 61.5 degree orbital location known as EchoStar III.

### B. *Irreparable Injury.*

■ Dominion relies heavily on the acknowledgments/admissions articulated in § 12.3.1 of the Agreement to establish the existence of irreparable harm. I see no way for EchoStar to avoid the implication of its concession in § 12.3.1. that the licensing, programming and exclusivity provisions conferred by the Agreement are unique such that their violation would give rise to "irreparable harm." And while I reject any general rule that parties may privately agree to a legal determination that will then bind a court required to make it, I conclude the understanding reflected in § 12.3.1 of the parties' Agreement in this case is a clear and unavoidable concession of the point and I will treat it as such.

■ In addition, however, I note various additional theories of irreparable harm advanced by Dominion miss the mark. For example, Dominion asserts its very existence is threatened by EchoStar's broadcast of FamilyNet and Daystar. Dominion presented some customer e-mails and expert opinion to support its contention that the availability of much of the same programming from EchoStar's DISH services will result in Dominion customers cancelling their Dominion-only subscriptions in favor of EchoStar. I find neither the e-mails nor the expert opinion persuasive. The proofs provided do not show that Dominion is losing customers or competitive position in the marketplace because of the violation of the exclusivity provisions. At most, Dominion simply states that such losses are an inevitable result. The statement is wholly conclusory and, standing alone, would not justify the issuance of a preliminary injunction.

Nor was there any evidence to support Dominion's assertion that it is close to business failure as a result of EchoStar's actions in broadcasting FamilyNet and Daystar. In fact, the opposite appears to be the case. EchoStar's expert witnesses persuasively demonstrated that a loss in the marketplace because of a particular reason would be readily determinable if

proper methodology were used. There is simply no basis for finding that Dominion has suffered harm to its goodwill as a result of EchoStar's actions.

Dominion's reliance on *American Television & Comm'ns Corp. v. Manning*, 651 P.2d 440, 445–46 (Colo.App.1982) as support for its position that the loss of potential and current customers due to the breach of a programming-exclusivity contract is similarly misplaced. *Manning* is not on point, and its holding that a "loss of customers would permanently impair plaintiff's reputation and ability to cultivate goodwill in the community," *see id.* at 446, is inapposite. In the instant case, it is the loss of programming exclusivity itself that creates the irreparable harm. Not only did Dominion and EchoStar say as much in § 12.3.1, but the very essence of the Agreement establishes it.

As previously explained, EchoStar leases eight transponders on EchoStar III to Dominion and Dominion subleased six of those transponders back to EchoStar with the FCC license rights attached. Thus, EchoStar is authorized to broadcast programming from the six subleased transponders on EchoStar III to DISH Network subscribers and Dominion uses the remaining two transponders to broadcast programming to Sky Angel subscribers. It is essential for subscribers of either or both broadcasters to use DISH brand equipment. Sky Angel's actual and potential subscriber market is thus limited to customers who either own or will purchase DISH brand receiving equipment.

The quid pro quo for this market limitation is that the programming offered by each party shall be mutually exclusive.

Under Section 8.1 of the Agreement, Dominion is entitled to broadcast only Christian programs and EchoStar may broadcast all other types except Christian programs. Section 8.3 defines "Christian Programs" as "video programming which has, as its overriding focus, Christian religious content and which is only marketed to appeal to the Christian theme and content." [3] In the unique circumstances of this relationship, the parties are joined at the hip and purely legal remedies for damages are neither adequate nor were they contemplated.

I conclude Dominion will suffer irreparable injury if an injunction is not issued because the parties conceded the point in § 12.3.1 of the Agreement and because EchoStar's violation of the exclusivity provision strikes at the heart of this Agreement.

## C. *Balance of Harms in Issuing Injunction Requested.*

■ I find the balance of harms rests clearly in favor of Dominion. As just stated, the exclusivity provision for Christian-religious programming when coupled with the exclusivity of EchoStar's receiving equipment and ownership of the satellite constitute the very heart of the Agreement and enterprise for Dominion. The wide latitude of programming available to EchoStar means that requiring it to honor the exclusivity provisions is little more than an inconvenience.

EchoStar asserts, however, that because FCC regulations require that DBS providers set aside four percent of channel capacity for eligible public interest programmers (47 C.F.R. § 25.701(c)), an injunction

---

**3.** At the time of contract, EchoStar was already broadcasting on the DISH Network two Christian-religious channels, Trinity Broadcasting Network (TBN) and Eternal World Television Network (EWTN) and so the exclusivity provision was deemed not to apply to them. In addition, the Agreement provided for the DISH Network to broadcast one Christian-religious channel carried on Sky Angel. At present that channel is Angel One, produced by Dominion.

requiring it to cancel broadcasting of Daystar and FamilyNet will subject it to sanctions for not meeting that regulatory requirement. EchoStar is whistling by the cemetery. It cites no authority nor any evidence that compliance with a district court injunction would be deemed by a regulatory agency to justify the imposition of penalties.

EchoStar's evidence discloses that because the FCC does not require it to seek out qualified public interest programmers, it has not done so. Rather, it has responded to inquiries. In balancing the harms, I find EchoStar will suffer little harm and only slight expense by exerting a positive effort to find and assist potential public interest programmers to meet its FCC obligations while at the same time honoring its obligations under the Agreement. The two are not at all inconsistent or in opposition.

### D. *Likelihood of Success on the Merits.*

■ The arbitration panel confirmed the appropriate test for determining what programming was exclusively Dominion's was whether the predominant theme of the overall programming of the channel is Christian as defined in the Agreement. I confirmed the Award as a judgment by an order entered on June 4, 2002.

· Given EchoStar's concession that Daystar is a "Christian" Programmer, the principle issues on the merits of the dispute are (1) whether the FCC 4% requirement preempts the parties' Agreement; (2) whether FamilyNet and Daystar are "qualified programmers" under the FCA and relevant regulations; and (3) whether the mere fact FamilyNet and Daystar are qualified renders EchoStar's obligations under the Agreement unenforceable. Based on my review of the relevant regulatory provisions that DBSes have discretion to choose between qualified applicants, I find EchoStar was in no way "required" to

choose the Christian-themed programmers it did. Moreover, I find that FCC regulations do not preempt the exclusivity provisions of the Agreement.

EchoStar has also argued that FCC regulations prohibit it from exercising editorial control over the content of public interest programs. Therefore, EchoStar erroneously concludes that selection of a programmer on the basis of the subject of the program is prohibited. This interpretation is a gross contortion of plain meaning.

The regulatory history establishes that Congress and the FCC intended to give DBS operators broad discretion and flexibility in selecting from among eligible programmers those who would be afforded public interest slots. In its report promulgating the public interest regulations, the FCC advised that Congress did not intend for the statutes or the regulations to control DBS provider's discretion to select what types of programmers would be able to use the public interest capacity. The explanation regarding "editorial control" provisions of the statute did not prohibit the providers from selecting the programmers who would be delegated public interest capacity. *See In re Implementation of Section 25,* 13 FCC Rcd. 24279, 1998 WL 814482 ("FCC Report") at ¶ 97–114. Once selected, the DBS provider is prohibited from editing content which would perforce make the program its own.

Applying the *Lundgrin* standard for the granting of preliminary injunctive relief, I need not make a final determination of the merits of Dominion's claims. Instead, I need only determine that Dominion has shown there are questions "so serious, substantial, difficult and doubtful as to make the issues ripe for litigation and deserving of more deliberative investigation." *See Walmer,* 52 F.3d at 854 (10th Cir.1995). Given the parties' commitment in § 16 of

their Agreement to arbitrate disputes of this nature, it should be for the arbitrators to decide whether EchoStar, in fact, is excused from its obligations under the exclusivity provisions by FCA § 335. I did, however, listen to a considerable amount of testimony relating to the merits of the case and will comment in some detail.

Most of the facts adduced at the hearing are not in dispute. Indeed, the parties stipulated that one of the channels, Daystar Television Network (Daystar) is a predominantly Christian-religious channel within the meaning of the Agreement. Another channel, FamilyNet, however, was the subject of spirited dispute. EchoStar has argued with vigor that FamilyNet does not contain predominantly Christian-religious programming and, therefore, is not within the ambit of the Agreement's exclusivity provisions. Two distinctions are claimed: First, that FamilyNet was presented to EchoStar by its employees as a "family values," rather than "Christian-religious," programmer. Second, that a considerable amount of viewing time, as much as 60%, in FamilyNet programs involves sports and other subjects.[4]

The evidence, however, clearly establishes that FamilyNet's overall programming is Christian-religious as defined in the Agreement. To describe FamilyNet as anything other than Christian-religious programming is absurd. It is true that some of the content of the programs is not specifically religious, but its use of eclectic information such as how well baseball teams are doing has but one purpose, and that is to bring the viewer to the program's ineluctable Christian-religious message. By analogy, one would have to say that Leonardo da Vinci's "The Last Supper" is not a religious painting because it merely portrays thirteen men having dinner.

More to the point, perhaps, is that FamilyNet is owned by the North American Mission Board of the Southern Baptist Convention. It is a member of the National Religious Broadcasters Association and it advertises itself in that organization's publications as containing programming based on Christian-religious values. Its president is an ordained Christian minister and it advertises itself in printed mailings as airing Christian-religious television.

In a contract with Sky Angel executed on July 8, 1998, FamilyNet certified that its programming was predominantly Christian-religious, that it was aware of the EchoStar–Dominion exclusivity provisions and that its programming fell within the definition of Christian programming under that Agreement. There was no evidence adduced at the hearing even suggesting that FamilyNet has endured a programmatic epiphany. The only inference is that in presenting itself to EchoStar, FamilyNet engaged in some monumental fibbing.

4. The use of word counts and percentages of air time in order to determine the predominant nature or quality of a program represents the kind of quantitative criteria that afflicts the entire broadcasting industry. Determining that which dominates or predominates is essentially a qualitative rather than a quantitative exercise. It brings readily to mind the statement by Newton Minow in his May 9, 1961 speech to the National Association of Broadcasters, "I have confidence in your health. But not in your product. I am here to uphold and protect the public interest. What do we mean by 'the public interest?'

Some say the public interest is merely what interests the public. I disagree. When television is good, nothing—not the theatre, not the magazines or newspapers—nothing is better. But when television is bad, nothing is worse. I invite you to sit down in front of your television set when your station goes on the air and stay there without a book, magazine, newspaper, profit-and-loss sheet or rating book to distract you—and keep your eyes glued to that set until the station signs off. I can assure you that you will observe a vast wasteland."

EchoStar's remaining assertions that an injunction would transgress First Amendment free speech rights, that Dominion unreasonably delayed seeking relief and that performance of the contract is impossible are exceedingly fanciful and do not merit further comment.

### E. *Bond.*

██ The fact the Agreement explicitly provides that either party may seek injunctive relief without having to post a bond complicates matters given the unavailability of any remedy for an improvidently granted injunction.[5] Again, I reject the notion that private parties may bind a court in its obligation to make specific legal determinations but find it difficult given the plain language of § 12.3.1 to condition the issuance of a preliminary injunction on the provision of a bond under Fed.R.Civ.P. 65(c). I view the issue more as one of estoppel: EchoStar's clear *ex ante* agreement that injunctive relief should be available to either party to enforce the exclusivity and other provisions of the Agreement without the need for a bond clearly allocated the risk of loss from an improvidently granted injunction to the party enjoined. Given this agreement, EchoStar is estopped from shifting the risk of loss back to Dominion. Rule 65(c) provides that no preliminary injunction shall issue except upon the giving of security by the applicant "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party ... found to have been wrongfully enjoined." Because EchoStar agreed to assume the risk of any such costs or damages, I find the proper amount of any bond in this case is $0.

### III. CONCLUSION.

██ Dominion's Motion For Preliminary Injunction is GRANTED. EchoStar shall immediately cease broadcasting both Daystar and FamilyNet as public interest programmers and shall not broadcast any Christian-religious programmers in violation of the exclusivity provisions of the Agreement until otherwise permitted to do so by a final arbitration award and,

Dominion and EchoStar shall immediately take such steps as are necessary to commence arbitration in accordance with the Agreement, and

This court shall retain jurisdiction over the case and the parties pending a final Arbitration Award.

Because the parties to the Agreement have, by the express terms of the Agreement, waived the giving of security by the applicant, I ORDER this preliminary injunction shall issue without the necessity of posting or filing a bond or other security.

---

**5.** I note the entire $10,000 bond amount issue and remand in Civil Action 01–K–206 might have been avoided had Dominion "located" Agreement § 12.3.1 in time to raise it in a timely fashion. I perceive no reason why the parties' agreement in this regard would not have been given effect. It is quite clear that both parties agreed that either could seek preliminarily to enjoin the other from violating the agreement without posting a bond or other security.